IN THE COURT OF CRIMINAL APPEALS


OF TEXAS
 





NO. PD-1136-05




 


THE STATE OF TEXAS



v.



EVON KELLY, Appellee





ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW


FROM THE THIRTEENTH COURT OF APPEALS


NUECES COUNTY





 Hervey, J., delivered the opinion of the Court in which Keller, PJ.,
Keasler, Holcomb and Cochran JJ., joined. Price and Johnson, JJ., concurred. 
Meyers and Womack, JJ., not participating. 



O P I N I O N 



 The issue in this case is whether the Court of Appeals misapplied the appellate standard of
review in reversing the trial court's order granting appellee's motion to suppress. We will affirm the
judgment of the Court of Appeals.

 At approximately 8:00 a.m. on March 5, 2001, appellee and her minor son were involved in
an accident in a car that appellee was driving. They were taken to a hospital emergency room for
emergency medical treatment. An emergency-room technician/phlebotomist (Gosson) drew
appellee's blood for medical treatment purposes. Hospital testing of this blood indicated that
appellee's blood-alcohol concentration was above the legal limit. Soon after this, the police came
to the emergency room and asked appellee for a specimen of her blood. She refused. Several days
later, the State obtained appellee's hospital blood-test results through a grand-jury subpoena.

 On May 5, 2001, an information was filed charging appellee with DWI. On May 14, 2003,
appellee filed a motion to suppress her hospital blood-test results. This motion alleged that the "use
of the results of testing on [appellee's] blood is not authorized by law and violates [appellee's]
Federal and State constitutional rights." (1) The only factual claim that appellee made in her motion
to suppress was that Gosson drew appellee's blood without appellee's "effective and informed
consent."

 The trial court held a hearing on appellee's motion to suppress on July 31, 2003. At the
beginning of this hearing, appellee abandoned any claim that Gosson obtained her blood in violation
of the Fourth Amendment and that the Fourth Amendment's exclusionary rule, therefore, excluded
her hospital blood-test results. Instead, she claimed that Gosson assaulted her in the emergency room
when he drew her blood for medical treatment purposes without her consent, (2) and that her hospital
blood-test results, therefore, should be suppressed under our state-law exclusionary rule in Article
38.23(a), Tex. Code Crim. Proc., which requires exclusion of evidence that is "obtained" in
violation of the law. (3) Appellee explained to the trial court:

 [THE DEFENSE]: The law states that the hospital-if they're not being directed by
police officers to draw blood, the police-the hospital workers have to have consent
of the person who is being treated to draw blood; otherwise, unless there's been life-threatening injuries or unless they're incoherent or unable to consent, they have to
have consent; otherwise, it's an assault, and it's excludable under 38.23 of the Code
of Criminal Procedure.* * *

 The way it occurred in this case and the way we're prepared to develop, Judge, is
there was an automobile accident. My client was taken to the hospital. She did not
give consent for a blood draw. I believe her husband gave consent,[ (4)] but she did not
give consent for a blood draw, but they just took blood from her. She did give
consent later on for a surgical procedure [to treat a collapsed lung] but not to the
blood draw. And-and if-I'll show the Court our cases. Judge, in Hailey the situation
was almost identical, Judge. That-that contains not only Hailey but also the cases
that are cited in Hailey. In Hailey the police took a guy who had been involved in an
accident to the hospital. They wanted him tested for possible alcohol poisoning. The
Defendant refused to permit the blood draw. The hospital employee took it anyway,
and the Court held that that was an assault and it was excludable under 38.23. 
Because the-38.23, the exclusionary rule, says the actions of a peace officer or other
individual if they commit an illegal act to obtain evidence, then it's excludable.

* * *

 Okay. So we're not talking about a Fourth Amendment seizure. And, in fact, if you
look at the Hailey case, it specifically addresses that issue, and it says, "Look, under
the Fourth Amendment of the Constitution of the United States it would be
admissible, but under 38.23 and under the laws of the State of Texas we can be more
cautious than the United States Constitution." And 38.23 says that if the State or any
other person illegally seizes the evidence, then it's not admissible. If you look at the
J. Johnson case, that case is a Court of Criminal Appeals En Banc case in a capital
murder case which you know there's never any good law out for a Defendant in a
capital murder case where they suppressed evidence that was taken from the scene
by private citizens. And they said, "Look, 38.23 says other people-" plain reading
of the statute says nobody else-I mean, that that's illegal. It's basically a theft and
so it's suppressed, and they suppressed this in a capital murder case. What happened
in this case is there's a car wreck, she's taken to the hospital, she's alert as the
medical records and the ambulance records that are-that have been filed with the
Court shows. She is alert and oriented. She is answering questions. If you look at
the neurological scale she makes a 15 on a scale of 15 as far as being oriented and
able to answer questions and spontaneous. They take her in. Her husband signs a
consent to treatment. She doesn't sign it. So once she doesn't sign that consent to
treat, and I think we have two statutes, Judge, on-and these may be what the Court
was referring to, consent for medical care under 773.008 of the Texas Health &
Safety Code is a consent for emergency care and outlines that they have [sic] to be
consent unless an individual is unable to communicate because of injury, accident,
illness or is unconscious and suffering from what appears to be life-threatening
injuries or illness, so it's conjunctive, meaning all of those things have to be there. 
313.004 is consent for medical treatment in a non-emergency situation but basically
has the same language. If an adult patient in a hospital or nursing home is comatose,
incapacitated, or otherwise mentally or physically incapable of communication, an
adult surrogate from the following list can consent. The problem is under the State's
own records that they have admitted into court, [appellee] was alert. She was
conscious. She responded to questions appropriately. She was able to answer
questions about her medical history. And I can direct the Court-I have tabbed some
of these things for the Court to see. The first one is one of their records talking about
her neurological, and it has a scale over here on how well she was oriented and the
questions that they asked her. Let's see. The second one also talks about being alert. 
The GC scale is 15. That's the neurological scale. That she is cooperative. That she
is not drowsy. She is not comatose and that [sic] she is not disoriented. And this is
all on this second page in the medical records that the State has offered to you. The
consent is also in here, and I'm sure I marked it, and I can find it for the Court, but
it is-here it is. It's signed by Mr. Kelly, William Kelly.

 

 Whether appellee consented to Gosson's blood draw was the only factual issue litigated at
the suppression hearing. Gosson testified at this hearing that he obtained appellee's consent to draw
her blood and that he would not have drawn her blood without her consent.

 Q. [PROSECUTION]: Can you please describe the procedure as to how you went
about drawing [appellee's] blood on that day?


 A. [GOSSON]: First, I obtained the orders on meditech, which is a set of orders that
tells us the type of blood draw to draw, and I went to the patient's room after
obtaining the necessary materials that are needed for that blood draw and I identified
myself to the patient, and I took her arm which had an arm band on it, and I made
sure that the arm band and the meditech orders matched, that her name matched on
the meditech orders, and I told her what my job title was, what I needed to do, and
asked for a consent to draw her blood.


 Q. Did you obtain that consent?


 A. I obtained her consent.


 Q. She didn't tell you "No, you can't have my blood"?


 A. I wouldn't have drew [sic] it.


 Q. Okay.


 A. She didn't tell me no.


 Q. If she had told you you can't draw her blood you indicated that you wouldn't have
done it. What would you have done after that?


 A. If she had stated that I could not obtain her blood from her I would have told her
that's okay. I wouldn't have drew [sic] her blood. I would have left. I would have
reported that to the nurse and, you know, that's all I can do.


 On cross-examination, Gosson testified that appellee did not refuse to let him draw her blood
which he interpreted to be consent.

 Q. [THE DEFENSE]: All right. So when you're talking about consent, she merely
acquiesced and she didn't withdraw or recoil, is that true-correct?


 A. [GOSSON]: She did not refuse.


 Q. So she didn't affirmatively refuse?


 A. Correct, she didn't.


 Q. That's your testimony here today?


 A. Correct.


 Q. And you're interpreting that lack of refusal to be consent?


 A. Yes, sir.


 When called by the defense to testify at the suppression hearing, appellee initially testified
that she did not recall consenting to Gosson's blood draw. She eventually testified that she did not
consent to this blood draw, which caused her physical pain.

 Q. [THE DEFENSE]: Did they ever ask you for consent to do that?


 A. [APPELLEE]: Not that I recall, no.


 Q. When they drew the sample were you conscious?


 A. Yes, I was.


 Q. Were you aware of your circumstances?


 A. Yes.


 Q. Were you able to answer questions of people who were treating you?


 A. Yes.


 Q. Do you recall any-any person asking you whether or not you gave consent or
approval for the blood draw?


 A. No, I do not.


 Q. Okay. And you did not consent to the blood draw?


 A. No.


 Q. Were you ever presented a-any documentation so that you could consent?


 A. No.


 Q. You were given documentation to consent to a surgical procedure that happened
sometime later at your stay at the hospital, is that correct?


 A. Yes.


 Q. Do you remember the blood draw?


 A. Yes, I do.


 Q. Did it hurt you?


 A. Yes.


 Q. Okay. Caused you physical pain?


 A. Yes.


 Appellee later testified on direct examination that Gosson never asked her for permission to
draw her blood. She also testified that, when she was later given a choice by the police to refuse or
to consent to a blood draw, she refused.

 Q. [THE DEFENSE]: And is it basically true that [Gosson] just went in and said he
was going to draw blood and you-


 A. [APPELLEE]: Yes.


 Q. Now, he never asked permission to draw blood, is that correct?


 A. No.


 Q. All right. And he never-and you never consented to this blood draw, is that
correct?


 A. No, I did not.


 Q. As a matter of fact, when somebody gave you the choices as to whether or not you
would allow a blood draw or not you refused, is that correct?


 A. Yes, I did.


 Q. And that came when the police officer after this blood draw came and told you
that you had-that they wanted a blood draw and that you had a right to either consent
or refuse, is that right?


 A. That's right.


 Q. And at that point once you were given a choice you refused, is that correct?


 A. Yes, I did.

 

 On cross-examination by the prosecution, appellee testified that Gosson told her "that blood
needed to be drawn, so [she] put [her] arm out." Appellee testified that she guessed that she
consented to Gosson's blood draw.

 Q. [PROSECUTION]: But you're saying you didn't understand what the gentleman
here, Mr. Gosson, was explaining to you with respect to the blood draw?


 A. [APPELLEE]: He didn't explain anything to me.


 Q. What is your recollection of what happened when he walked into the room?


 A. My recollection is he said, "I'm here to take your blood." And that-I mean, there
were people doing all kinds of things. I was horizontal.


 Q. Let me just stop. We'll go one at a time. And when he says, "I'm here to take
your blood," did you say to Mr. Gosson "Not a chance"?


 A. No, I did not.


 Q. Did you tell him under no circumstances did you want him to draw any blood
from you?


 A. No, I did not.


 Q. And what's the next thing that he said to you?


 A. I really don't recall.


 Q. Okay. And at the time did you think it would be in your best medical interests to
have the blood drawn so you could be treated by the medical staff?


 A. That was what needed to be done.


 Q. So then you understood that it needed to be-the blood needed to be drawn; you
understood that, correct?


 A. I was told that blood needed to be drawn, so I put my arm out.


 Q. Okay. And you understood you were receiving medical treatment at that time,
correct?


 A. Yes, I did.


 Q. And you had what was called-did you subsequently become aware that you had
a pneumothorax?


 A. A collapsed lung?


 Q. Yes, ma'am.


 A. Yes.


 Q. Now, you knew that they needed to draw blood to adequately treat you medically,
is that correct?


 A. I did not know that. I was just told that the blood was going to be drawn from me.


 Q. And you consented by not refusing because you knew that was part of your
medical treatment, is that correct?


 A. I consented.


 Q. You did consent?


 A. Well, I put my arm out.


 Q. So you did consent-you would agree with me you did consent?


 A. I guess so.


 On re-direct examination by the defense, appellee testified that she did not consent to
Gosson's blood draw.

 Q. [THE DEFENSE]: Okay. And I guess you know you got talked into saying that
you consented, but did you consent?


 A. [APPELLEE]: No.


 During closing arguments to the trial court, appellee claimed that Gosson "obtained" her
blood in violation of the law for Article 38.23(a) exclusionary-rule purposes because Gosson
assaulted her when he drew her blood for medical treatment purposes with only her "mere
acquiescence." 

 [THE DEFENSE]: -Article 10, okay. Since it was a non-police, then the Fourth
Amendment doesn't apply because the Fourth Amendment of the Constitution only
applies if it's a police action, okay, but 38.23 still applies. And so then we got to
look at 38.23 and decide whether or not this was a consensual drawing of the blood
by a private citizen. Because 38.23 says as it says in the Johnson case "or other
person". The testimony here, the records are that she was oriented, she knew who
she was, she knew where she was, she knew what was going on, and she did not
consent to the blood draw. She never-she merely acquiesced. There are reams of
case law from the United States Supreme Court-I didn't bring it today because I
didn't realize this was going to be such a prominent issue-but the Court is well aware
that mere acquiescence is not consent, and that's throughout Texas case law and
throughout the United States Constitutional case law. But the issue before the Court
is to determine whether or not she consented to the blood draw. And if she did not
consent then, technically, it's an assault. Whether or not she filed charges doesn't
matter. Whether or not she filed a civil suit doesn't matter. The question is whether
or not it was drawn without consent. The consent form is signed by her husband. If
you look at the time on the blood alcohol test I believe it's 9:30 in the morning. 
There's a subsequent consent to the procedure, and I don't want to call it a surgery
because they did it right there in the Emergency Room where they put the tube in
between the ribs to reinflate the lung. And there is a consent for that specific
procedure, but there is no consent for the blood draw. If there's no consent for the
blood draw, then it is technically whether actionable or whether it should be actioned
on, it is technically an assault under 22.01 of the Texas Penal Code because we've
shown that it was intentionally done. He testified he went in there intentionally to
do it; you know, that it hurt, so we've got intentionally caused bodily injury-pain. 
And that's directly the logic that is followed by the Hailey case.[ (5)]


 Following arguments by counsel, the trial court indicated that it wanted additional briefing
from the parties on the "acquiescence question" and "anything else" about the "question of doing
this end run thing." (6)

 [THE DEFENSE]: What particular points do you want? The mere acquiescence
question?


 [TRIAL COURT]: That's one question, and if there's anything else either one of you
can glean about this question of doing this end run thing. Okay.


 [PROSECUTION]: Yes, Your Honor.


 [TRIAL COURT]: I'd like it about two weeks from now.


 [THE DEFENSE]: Do you want it briefed or just cases, Your Honor?


 [TRIAL COURT]: I want a brief.


 On August 8, 2003, appellee filed a brief in the trial court on "inadmissibility of blood
evidence." This brief appears at pages 131 to 137 in the Clerk's transcript. Appellee's brief
asserted:

 The evidence, viewed in light most favorable to the State, shows that [appellee]
merely acquiesced to Gosson's statement that he was going to draw her blood. This
acquiescence was obtained at a time when she was being treated for her injuries by
several hospital employees. Voluntary consent is not shown by mere acquiescence
to authority. (Citations omitted).

 

 Appellee's brief also raised a new factual claim--that hospital personnel illegally disclosed
appellee's hospital blood-test results to the police before the police requested appellee to provide a
blood specimen. (7) Appellee's brief asserted that the police learned of appellee's hospital blood-test
results only "through disclosures by an ER nurse [Hertsch] and a treating physician [Blanchard]." (8) 
Appellee's brief claimed that her hospital blood-test results should have been suppressed as "fruits"
of this initial illegality by hospital personnel. Appellee's brief asserted:

 Neither nurse Hertsch, nor Dr. Blanchard had [appellee's] written or, for that matter,
oral authority to disclose information regarding her blood alcohol content to the
officers. (That she did not wish for the police to have this information is made clear
by her refusal to submit to a voluntary blood draw.) It is also clear that, but for the
disclosures, the officers would not have pursued their DWI investigation.


 The disclosures were unauthorized and made in violation of Texas Health and Safety
Code Section 241.151 et seq, and are thus not admissible under 38.23 of the Texas
Code of Criminal procedure. Although 241.153(20) does allow for disclosure in
order to comply with a subpoena, if it had not been for the illegal acts of Nurse
Hertsch and Dr. Blanchard, the State would not have had knowledge of the test
results and would not have subpoenaed the records. The results are therefore
inadmissible under the provisions of Art. 38.23, as "fruit of the poisonous tree." 
(Citations omitted).[ (9)]


 The next document at pages 138 to156 in the Clerk's transcript is entitled "State's Brief In
Opposition Of Motion To Suppress." This brief contains no file-stamp showing when it was filed,
it is not signed, and it contains no certificate of service showing that it was sent to the defense. This
brief addresses three issues: whether appellee consented to Gosson's blood draw, whether Gosson
assaulted appellee when he drew her blood, and whether appellee had a reasonable expectation of
privacy in her medical records which, according to the State's brief, was relevant to whether the
State could obtain these medical records pursuant to a grand-jury subpoena. The State's brief did
not address appellee's new factual claim that hospital personnel (Hertsch and Blanchard) illegally
disclosed the results of appellee's hospital blood-test results to the police.

 On February 17, 2004, the trial court signed an order granting appellee's motion to suppress
without making any written findings of fact or conclusions of law explaining the factual or legal
basis for its ruling. The State appealed. The only question presented in the State's brief on direct
appeal was whether the trial court abused its discretion "in suppressing blood-alcohol test results
where there is no reasonable expectation of privacy in medical records showing blood-alcohol test
results from tests taken by hospital personnel solely for medical purposes after a traffic accident?" 
In its brief on direct appeal, the State argued that there is "no Fourth Amendment reasonable
expectation of privacy and no statutory physician-patient privilege of confidentiality that protects the
record of blood test results of an injured motorist from being given to law enforcement officers
pursuant to a grand jury subpoena."

 Appellee's brief on direct appeal responded that the State was attempting "to change the
focus of the trial court's concerns" from "whether the appellant's [sic] blood was seized illegally in
the first place to whether the State's subsequent grand jury subpoena somehow made the results of
an otherwise illegal search admissible." (10) See also Spebar v. State, 121 S.W.3d 61, 63-64
(Tex.App.-San Antonio 2003, no pet.) (rejecting similar claim made by prosecution because
defendant did not claim violation of right to privacy, but claimed that results of his blood-test were
inadmissible because hospital personnel assaulted him by taking his blood). Appellee's brief on
direct appeal also claimed that the trial court properly suppressed appellee's hospital blood-test
results because "the evidence, viewed in light most favorable to the State, shows that appellee
passively acquiesced[ (11)] to the hospital's blood draw" which, according to appellee, did not equal
consent. Appellee's brief also reasserted her new factual claim that hospital personnel (Hertsch and
Blanchard) illegally disclosed appellee's hospital blood-test results to the police.

 The Court of Appeals decided that the Fourth Amendment's exclusionary rule did not
exclude appellee's hospital blood-test results obtained by the State through the grand-jury subpoena
because no reasonable expectation of privacy existed in the medical records containing appellee's
hospital blood-test results. See State v. Kelly, 166 S.W.3d 905, 911 (Tex.App.-Corpus Christi 2005)
citing State v. Hardy, 963 S.W.2d 516, 527 (Tex.Cr.App. 1997) (any interests society has in
safeguarding privacy of medical records "are not sufficiently strong to require protection of blood-alcohol test results from tests taken by hospital personnel solely for medical purposes after a traffic
accident"). (12) The Court of Appeals also decided that the blood draw by Gosson did not implicate
the Fourth Amendment because that involved purely private action and not police conduct. See
Kelly, 166 S.W.3d at 910. (13)

 The Court of Appeals also declined to address several other theories, including appellee's
new factual theory that hospital personnel illegally disclosed appellee's hospital blood-tests to the
police, that might have supported the trial court's ruling granting appellee's motion to suppress. See
Kelly, 166 S.W.3d at 909-10. (14) The Court of Appeals further decided that, even if appellee did not
consent to Gosson's blood draw, the record does not support "exclusion of the evidence on grounds
of assault" because Gosson reasonably believed that appellee consented and the drawing of her blood
neither threatened nor inflicted serious bodily injury. See Kelly, 166 S.W.3d at 915; see also Section
22.06 (1), Tex. Pen. Code, (actor's reasonable belief that victim consented to actor's conduct is a
defense to assault prosecution if the conduct did not threaten or inflict serious bodily injury). (15)

 Finally, in considering whether Gosson's blood draw violated a provision of the Texas Health
and Safety Code apparently requiring a patient's consent for emergency medical care, (16) the Court of
Appeals ultimately decided that appellee "consented to the blood extraction, despite her inconsistent
testimony to the contrary." (17) See Kelly, 166 S.W.3d at 915-16. (18) We exercised our discretionary
authority to review this decision and to address the claim that the Court of Appeals misapplied the
appellate standard of review by failing to view the evidence in the light most favorable to an implied
finding that appellee did not consent to Gosson's blood draw. The ground upon which we granted
discretionary review states:

 The Court of Appeals has decided an important question of state and federal law in
a way that conflicts with the applicable, controlling decisions of the Texas Court of
Criminal Appeals.

 

 In reviewing a trial court's ruling on a motion to suppress, an appellate court must view the
evidence in the light most favorable to the trial court's ruling. (19) When a trial court makes explicit
fact findings, the appellate court determines whether the evidence (viewed in the light most favorable
to the trial court's ruling) supports these fact findings. The appellate court then reviews the trial
court's legal ruling de novo unless the trial court's supported-by-the-record explicit fact findings are
also dispositive of the legal ruling.

 The appellate standard of review is very similar when the record is silent on the reasons for
the trial court's ruling or when the trial court makes no explicit fact findings and neither party has
timely requested findings and conclusions from the trial court. (20) Under these circumstances, the
appellate court implies the necessary fact findings that would support the trial court's ruling if the
evidence (viewed in the light most favorable to the trial court's ruling) supports these implied fact
findings. The appellate court then reviews the trial court's legal ruling de novo unless the supported-by-the-record implied fact findings are also dispositive of the legal ruling. (21)

 Appellate courts should also keep in mind that the party with the burden of proof assumes
the risk of nonpersuasion. If this party loses in the trial court and the trial court makes no explicit
fact findings, then this party should usually lose on appeal. Our decision in Ross illustrates this. See
Ross, 32 S.W.3d at 855-59 and at 857 ("Given the absence of any factual findings, the appellate
presumption of the regularity of a trial court's judgment, and which party had the burden of proof,
the trial court's implied factual findings were dispositive of the ultimate constitutional question of
probable cause.") quoting Villarreal v. State, 935 S.W.2d 134, 140 (Tex.Cr.App. 1996). (22) We understand appellee to argue in her discretionary review petition and in her brief that the
Court of Appeals misapplied the appellate standard of review by not viewing the evidence on the
issue of appellee's consent to Gosson's blood draw in the light most favorable to appellee and the
trial court's ruling granting appellee's motion to suppress. We also understand appellee to argue that
the evidence, viewed in the light most favorable to the trial court's ruling granting her motion to
suppress, supports an implied fact finding that she did not consent to Gosson's blood draw. For
example, in her discretionary review petition, appellee asserted:

 The trial court, the judicial officer charged with weighing the demeanor and the
credibility of witnesses was free to believe any witness in favor of other witnesses;
and, he was free to believe some portions of an individual's testimony and disregard
other portions. As this Honorable Court has stated, great deference should be given
to a trial court's findings of fact.


 Nevertheless, the Court of Appeals did not review, de novo, the law as it applied to
the facts; instead, it chose to weigh the credibility of certain portions of the
appellant's [sic] testimony against other portions; and, having done so, it then
determined that those portions were more credible than certain other portions. It then
found the appellant had consented to her blood being drawn. The problem with
doing this sort of thing is that it violates the dictates of Guzman and Carmouche.

 

 In this case, however, we find it difficult to conclude that the record is silent on the factual
basis for the trial court's ruling granting appellee's motion to suppress. Following the suppression
hearing, appellee argued several times that she "merely acquiesced" to Gosson's blood draw. The
trial court also indicated that it wanted additional briefing on the "acquiescence" question. A fair
reading of the record indicates that appellee ultimately claimed, and the trial court found, that she
"merely acquiesced" to Gosson's blood draw. (23) And, viewed in the light most favorable to the trial
court's ruling, the evidence supports this finding.

 Even if the record is silent on the factual basis of the trial court's ruling, the evidence, viewed
in the light most favorable to the trial court's ruling, does not support an implied fact finding that
appellee did not consent to Gosson's blood draw. Though appellee testified (and the record would
support an implied finding) that she did not consent by expressly giving Gosson permission to draw
her blood, no one testified that she expressly refused to give Gosson permission to draw her blood. 
On the contrary, appellee testified that, when Gosson told her that he was in the emergency room to
draw her blood, she did not refuse or tell him "not a chance." Viewed in the light most favorable
to the trial court's ruling, the evidence supports only an implied finding that appellee put her arm out
when Gosson told her that he was in the emergency room to draw her blood for medical treatment
purposes. In other words, viewed in the light most favorable to the trial court's ruling, the evidence
supports only an implied finding that appellee "merely acquiesced" to Gosson's blood draw. See
Webster's II New Collegiate Dictionary 10 (1999) (defining "acquiescence" as, among other things,
"[u]nprotesting assent").

 And, we decide that an express or implied finding of "mere acquiescence" to Gosson's blood
draw also constitutes a finding of consent to the blood draw. Webster's II New Collegiate
Dictionary defines "consent" as, among other things, "[v]oluntary allowance of what is planned or
done by another." Webster's II New Collegiate Dictionary 240 (1999). We further note that this
same dictionary defines "acquiesce" as, among other things, "[t]o consent or comply without
protest." Webster's II New Collegiate Dictionary 10 (1999). Also, according to the Roget's Desk
Thesaurus, "consent" and "acquiesce" are synonymous terms. Roget's Desk Thesaurus 9, 111
(2001).

 Appellee nevertheless relies on the United States Supreme Court's decision in Bumper v.
North Carolina, 391 U.S. 543, 548-49 (1968), to argue that "voluntary consent is not shown by a
mere acquiescence to authority." Bumper held that the prosecution did not sustain its burden to
prove that a consent to a search was lawful "by showing no more than acquiescence to a claim of
lawful authority." See id. In Bumper, the defendant's mother told the police to "go ahead" and
search her house when one of four officers who appeared at her front door announced that he had
a search warrant to search the house. See Bumper, 391 U.S. at 546. The Supreme Court held that
a search cannot be justified as lawful on the basis of consent when that "consent" has "been given
only after the official conducting the search has asserted that he possesses a warrant." In Bumper,
391 U.S. at 550, the Court stated:

 When a law enforcement officer claims authority to search a home under a warrant,
he announces in effect that the occupant has no right to resist the search. The
situation is instinct with coercion-albeit colorably lawful coercion. Where there is
coercion there cannot be consent.

 

 This case clearly does not present the same situation as that presented in Bumper. We decline
to hold that Gosson's informing appellee that he was in the emergency room to draw her blood (for
medical treatment purposes) is a claim of lawful authority to draw her blood without her consent,
which could be used against her later, effectively announcing that appellee had no right to resist the
blood draw. The other United States Supreme Court case cited in appellee's brief actually supports
the proposition that appellee did not have to be told that she could refuse to consent to Gosson's
blood draw in order for her acquiescence to be considered a valid consent. See Schneckloth v.
Bustamonte, 412 U.S. 218, 227 (1973) (while knowledge of the right to refuse consent is one factor
to be taken into account, the government need not establish such knowledge as the sine qua non of
an effective consent).

 The judgment of the Court of Appeals is affirmed.


 Hervey, J.


Delivered: October 25, 2006

Publish
1. Appellee's motion to suppress further alleged that the failure to suppress appellee's hospital
blood-test results would "violate [appellee's] rights under the Texas Code of Criminal Procedure,
including Articles 1.04, 1.05, 1.051, 1.06, 18.01, 18.02, and 38.23; and her rights under the Texas
Constitution, including her rights under Article I, §§ 9, 10, and 19; and her rights under the United
States Constitution, including her rights under the Fourth, Fifth, Sixth, and Fourteenth
Amendments." 
2. See Section 22.01(a)(1), Tex. Pen. Code, (person commits assault if he intentionally,
knowingly or recklessly causes bodily injury to another); Section 1.07(a)(8), Tex. Pen. Code,
(defining bodily injury as physical pain, illness, or any impairment of physical condition). 
3. In support of this claim, appellee relied on the Waco Court of Appeals' decision in Hailey
v. State which this Court reversed on grounds not applicable here. See Hailey v. State, 50 S.W.3d
636 (Tex.App.-Waco 2001), rev'd, Hailey v. State, 87 S.W.3d 118 (Tex.Cr.App. 2002), cert. denied,
538 U.S. 1060 (2003). In Hailey, the Waco Court of Appeals decided that blood drawn from the
defendant by hospital personnel for medical treatment purposes without the defendant's consent
"was an assault, and therefore illegal" for Article 38.23(a) state exclusionary rule purposes. See
Hailey, 50 S.W.3d at 639-40. This Court reversed the Waco Court of Appeals' decision in Hailey
because this theory was not raised or litigated in the trial court or even raised in the Court of
Appeals. See Hailey, 87 S.W.3d at 120-22; see also Hailey, 50 S.W.3d at 641-43 (Gray, J.,
dissenting). This Court's decision in Hailey does not control the disposition of this case because
appellee timely raised the issue of her consent to Gosson's blood draw. 
4. No one claims here that appellee's husband's consent was binding on appellee.
5. Emphasis added.
6. This appears to be a reference to the State obtaining appellee's medical records through a
grand-jury subpoena.
7. See Section 241.152(a), Tex. Health & Safety Code, (generally prohibiting hospital
personnel from disclosing patient's health-care information without patient's written authorization). 
8. Attached as an exhibit to appellee's motion is a police offense report stating that Hertsch
made unsolicited statements to the police that appellee was intoxicated "based on the hospital's
blood screening."
9. This claim, therefore, turned on whether hospital personnel (Hertsch and Blanchard) illegally
disclosed the results of appellee's hospital blood-test results to the police, and not on whether
appellee consented to Gosson's blood draw. 
10. Appellee made the same claim when the prosecution made the same argument to the trial
court at the suppression hearing.


 [THE PROSECUTION]: The blood evidence is admissible. As far as State v. Hardy,
it's a Court of Criminal Appeals, 963 S.W.2d 516. It examines as far as the
admissibility of blood evidence and whether or not there's a [sic] expectation of
privacy and the results of the blood taken from the hospital. Specifically it cites
Clark v. State, which is a Corpus Court of Criminal Appeals [sic]. It says, "We note
that five Texas appellate courts have addressed, in published opinions, whether, after
the promulgation of Rule 509, a reasonable expectation of privacy exists in medical
records containing blood test results where the records were made for medical
purposes but were later subpoenaed by a Grand Jury. Four out of five held that
society does not recognize as reasonable an expectation of privacy in those kinds of
records." And one of those courts is the Corpus Christi Court of Appeals, Your
Honor.


 [TRIAL COURT]: Response.


 [THE DEFENSE]: Your Honor, we're not talking about-we're not talking
about-we're talking about the legality of the initial seizure of the blood evidence, not
the-not the propriety of subpoenaing hospital records. We're talking about the initial
seizure of the blood evidence by the hospital.
11. Emphasis added.
12. Appellee did not challenge this decision in her discretionary review petition. And, we have
noted elsewhere in this opinion that she did not challenge in the trial court or in the Court of Appeals
the grand-jury subpoena process by which the State obtained her medical records. See, e.g., Footnote
10.
13. Appellee did not challenge this decision in her discretionary review petition.
14. Appellee did not challenge these decisions in her discretionary review petition. 
15. Appellee did not challenge this decision in her discretionary review petition. We further note
that two other courts of appeals have declined to find an assault in cases similar to this. See Ramos
v. State, 124 S.W.3d 326, 334-36 (Tex.App.-Fort Worth, 2003, pet. ref'd); Spebar v. State, 121
S.W.3d at 63-64. 
16. See Section 773.008, Tex. Health & Safety Code.
17. Exceptions authorized by Section 773.008 do not apply here.
18. The decision of the Court of Appeals states:


 Viewed in the light most favorable to the trial court's ruling, the evidence shows that
Kelly was "conscious and able to communicate" as she asserts. The evidence
reasonably infers that she could have signed a written consent for treatment. Even
so, the evidence also establishes that she unequivocally admitted, under oath, that she
consented to the extraction of blood. Oral consent is sufficient. (Citation omitted). 
Further, the objective physical manifestation of Kelly's consent is established by the
admitted extension of her arm to allow the extraction of the blood. Kelly allowed
multiple procedures on her person, including bracing her body for transport and the
transportation for the sole purpose of emergency medical care. Indeed, these are not
manifestations of a "mere acquiescence of authority." The blood extraction was
solely for medical purposes. Consent for the blood sample reasonably contemplates
the use of blood in furtherance of her emergency medical diagnosis and treatment. 
To isolate the blood extraction, admittedly done in furtherance of her medical
treatment, and attest in hindsight that it was the sole act she did not consent to belies
the evidence in the case. "It is axiomatic that if there was consent to or a request for
treatment, any complaint by [the defendant] that blood was taken illegally would be
negated." (Citations omitted). We conclude that the evidence establishes that Kelly
consented to the blood extraction, despite her inconsistent testimony to the contrary. 
Accordingly, we conclude that Kelly's theory that the alcohol-blood test results are
inadmissible under article 38.23, because she did not consent to the blood extraction
for medical purposes, is not reasonably supported by the record. We cannot uphold
a trial court's ruling on a suppression motion if it is not reasonably supported by the
record and is not correct on any theory of law applicable to the case. (Citations
omitted).


Kelly, 166 S.W.3d at 916. 
19. Because the trial court granted appellee's motion to suppress, the Court of Appeals was
required to view the evidence in the light most favorable to the appellee, not the State. 
20. See State v. Cullen, 195 S.W.3d 696, 700 (Tex.Cr.App. 2006) (requiring a "trial court to
express its findings of fact and conclusions of law when requested by the losing party"). 
21. This description of the appellate standard of review is consistent with case law. See State
v. Ross, 32 S.W.3d 853, 855-56 (Tex.Cr.App. 2000); Carmouche v. State, 10 S.W.3d 323, 328-28
(Tex.Cr.App. 2000); Guzman v. State, 955 S.W.2d 85, 85-89 (Tex.Cr.App. 1997); see also State v.
Terrazas, 4 S.W.3d 720, 725 (Tex.Cr.App. 1999) (since trial court made no express fact findings,
appellate court was required to infer all necessary fact findings that would support the trial court's
ruling). Illustrative of when supported-by-the-record implied fact findings are not dispositive of the
trial court's legal ruling is our decision in Terrazas, in which the trial court's supported-by-the-record implied fact finding was not dispositive of the trial court's legal ruling that the defendant's
confession was involuntary. See Terrazas, 4 S.W.3d at 725-27. We have also stated that the
appellate court should uphold the trial court's decision if it is correct on any theory of law applicable
to the case. See Ross, 32 S.W.3d at 855-56; Romero v. State, 800 S.W.2d 539, 543 (Tex.Cr.App.
1990). Appellee has challenged only the Court of Appeals' decision on the issue of her consent to
Gosson's blood draw and has not challenged the Court of Appeals' decisions on the alternate legal
theories that might have supported the trial court's ruling granting appellee's motion to suppress.
22. It is important to note that appellee had the initial burden to produce evidence to support a
finding that she did not consent to Gosson's blood draw. See Ford v. State, 158 S.W.3d 488, 492
(Tex.Cr.App. 2005) (to establish Fourth Amendment violation, defendant bears initial burden of
producing evidence to support finding of improper police conduct such as proving that a search
occurred without a warrant shifting the burden to the State to establish the validity of the search);
Russell v. State, 717 S.W.2d 7, 9-10 (Tex.Cr.App. 1986) (as movant in a Fourth Amendment motion
to suppress evidence, defendant must produce evidence that defeats presumption of proper police
conduct); Mattei v. State, 455 S.W.2d 761, 766 (Tex.Cr.App. 1970); see also Terrazas, 4 S.W.3d
at 725-28 (defendant claiming that her confession was involuntary had burden to present evidence
raising a voluntariness question). Unless appellee carried this initial burden, it cannot be argued that
the prosecution ever assumed the burden of proof with the risk of nonpersuasion. Compare
Terrazas, 4 S.W.3d at 727 (prosecution never assumed burden of proof with risk of nonpersuasion
on issue of voluntariness of defendant's confession because defendant did not carry her initial burden
to present evidence to support a finding of involuntariness). 
23. We also do not read appellee's brief on direct appeal in the Court of Appeals to claim that
the evidence supports an implied fact finding that she did not consent to Gosson's blood draw. She
argued in her brief on direct appeal:


 In the instant case, the evidence, viewed in light most favorable to the State, shows
that the appellee passively acquiesced to the hospital's blood draw. Voluntary
consent is not shown by a mere acquiescence to authority. (Citations omitted). The
State bears the burden of proving voluntary consent by clear and convincing
evidence. (Citation omitted). In this case, the State failed to carry that burden.