

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-11-00254-CR

MIGUEL BRIONES                                                 APPELLANT

V.

THE STATE OF TEXAS                                                   STATE

----------

## FROM COUNTY CRIMINAL COURT NO. 9 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

Appellant Miguel Briones pled guilty to driving while intoxicated (DWI) after the trial court denied his motion to suppress results of his breath test. He reserved the right to appeal the trial court's ruling, and he claims that a police officer's failure to accommodate his hearing disability when reading the statutory

---

[1]*See* Tex. R. App. P. 47.4.

warning rendered his consent to take the breath test unknowing and involuntary. We affirm.

**Background Facts and Procedural History**

Arlington Police Officer Nicholas Harper stopped Appellant in a gas station parking lot around 3:25 a.m. Appellant wore two "fairly large" hearing aids and at times appeared to lip read as the officer spoke to him. Harper determined that Appellant had some degree of hearing loss but also that, because Appellant appropriately responded to questions, whatever impairment he had did not prevent the two from effectively communicating with one another. Appellant followed Harper's instructions to produce his driver's license and proof of insurance, and he answered questions about how much he had drunk. He also appeared to have no difficulty following instructions on three field-sobriety tests, including the horizontal-gaze nystagmus (HGN), the walk-and-turn, and the one-leg stand.

After these tests, Harper arrested Appellant for DWI and took him to jail, escorting him to a room outfitted with a video camera and breath-testing equipment. A DVD video recording admitted at the hearing on Appellant's suppression motion shows Appellant leaning against a wall in the room looking down. When Harper told him not to lean against the wall, he complied—without lifting his head or having looked at the officer. Nor did Appellant look at Harper when asked to state his "full name," "date of birth," and "full home address." To each of these, Appellant responded appropriately without looking up. Similarly,

2

he responded appropriately without looking at the officer when asked whether he understood that he was being videotaped. Finally, Appellant did not look up or toward the officer when asked whether he had anything in his mouth but replied "no" and—in response to Harper's asking for proof—he stuck out his tongue.

Harper then instructed Appellant on the walk-and-turn and the one-leg-stand field-sobriety tests. For the former, Harper demonstrated three steps and told Appellant to perform seven. When Appellant had performed the walk-and-turn earlier at the gas station, he had taken nine steps, but at the jail he performed seven as Harper had instructed. Appellant testified at the suppression hearing that he took seven steps at the jail because he had heard Harper say the word "seven."

The video shows that after Appellant had completed the field sobriety tests, Harper handed him a document, which no one disputes was a copy of the DIC–24—a form containing the statutory warnings required before the police may request a specimen for testing[2]—to read along with Harper as Harper read the warnings out loud. As Harper began reading, Appellant asked him to slow down, and although both Appellant and Harper testified that Harper did not slow down, our review of the video shows that he may have slowed somewhat.[3]

---

[2]*See* Tex. Transp. Code. Ann. § 724.015 (West Supp. 2011).

[3]If he did, though, it was not by much.

In his brief, Appellant states that he *kept* asking Harper to slow down. The record, however, does not support the implication that he asked more than once. Appellant testified that he remembered asking Harper to slow down and that he did not. But there was no testimony that Appellant asked multiple times. Harper testified that he did not recall Appellant asking him to slow down, that he did not see Appellant ask him to on the video, and that he did not, in fact, slow down. Our review of the video shows that Appellant asked Harper one time to slow down when he first started reading, and that when the officer resumed reading, Appellant did not ask again.

After reading the DIC–24, Harper asked Appellant if he understood what he had read, and Appellant responded "yes." Next, Harper requested a breath test, to which Appellant said "yes."

Harper then read two more forms—one containing *Miranda* warnings.[4] After he had read these to Appellant, Harper asked if Appellant would answer some questions. To this, Appellant shook his head "no."

Harper repeated the request for a breath sample, and Appellant again said he would give one.

While another officer in the room readied the breath-testing equipment, Appellant asked about a blood test. The officer replied that a blood sample could not be taken there and that he would have to go to the hospital for a blood test,

_____

[4]*See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612 (1966).

and Appellant appeared to let the matter drop. Appellant then submitted two breath samples, the results of which were the subject of his motion to suppress.

## Appellant's Issue

Appellant claims that the trial court should have suppressed the breath-test results because the police did not provide a sign-language interpreter to assist him while Harper read the DIC–24. Appellant contends that the failure to provide an interpreter violated federal and state law, particularly Title II of the Americans with Disabilities Act (ADA). We need not address whether the ADA applies in this case because under the appropriate standard of review, the record supports the trial court's express finding that Appellant heard the officer read the DIC–24 well enough to have knowingly and voluntarily consented to give a breath sample, and the record also would have supported a finding that Appellant understood the warning by having read it himself.

## Standard of Review

We review a trial court's ruling on a motion to suppress in the light most favorable to the ruling. *Wiede v. State*, 214 S.W.3d 17, 24 (Tex. Crim. App. 2007); *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). When the trial court makes explicit findings of fact, as it did in this case, we determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports those findings. *Kelly*, 204 S.W.3d at 818–19. We then review the trial court's legal ruling de novo unless its explicit fact findings that are supported by the record are also dispositive of the legal ruling. *Id.* at 818.

5

We must uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case even if the trial court gave the wrong reason for its ruling. *State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *Armendariz v. State*, 123 S.W.3d 401, 404 (Tex. Crim. App. 2003), *cert. denied*, 541 U.S. 974 (2004).

**The Statutory Warnings**

The transportation code provides that a person arrested for DWI is deemed to have consented to providing one or more specimens of the person's breath or blood for analysis to determine alcohol concentration or presence of a controlled or other substance. Tex. Transp. Code Ann. § 724.011(a) (West 2011). An adult person arrested for DWI must be warned that refusal to submit to a breath test will result in certain consequences, and he must likewise be informed of the possible consequences if he submits to the test and the results show a prohibited blood-alcohol level. *See id.* § 724.015(1)–(3); *State v. Amaya*, 221 S.W.3d 797, 800 (Tex. App.—Fort Worth 2007, pet. ref'd).

A suspect's consent to a breath test must be voluntary. *Turpin v. State*, 606 S.W.2d 907, 914 (Tex. Crim. App. [Panel Op.] 1980) (applying former version of section 724.015). For consent to a breath test to be deemed voluntary, a suspect's decision must not be the result of physical pressure or psychological pressure brought to bear by law enforcement officials. *See Thomas v. State*, 723 S.W.2d 696, 704–05 (Tex. Crim. App. 1986) (recognizing that consent to breath test is not voluntary if induced by physical force or mental

6

coercion); *Schafer v. State*, 95 S.W.3d 452, 455 (Tex. App.—Houston [1st Dist.] 2002, pet. ref'd) (recognizing that consent to breath test is not voluntary if induced by misstatement of direct statutory consequences of refusal). A suspect's decision to submit to a breath test must be his own, made freely, and with a correct understanding of the statutory consequences of refusal. *Erdman v. State*, 861 S.W.2d 890, 893 (Tex. Crim. App. 1993).

### Substantial Compliance Standard

This court has held that warnings given to a DWI suspect need not track the statutory language verbatim. *Gonzalez v. State*, 967 S.W.2d 457, 458 (Tex. App.—Fort Worth 1998, no pet.). Substantial compliance will suffice so long as the warnings given do not include extra warnings that are not found in the statute. *Id*. Despite the statute's plain language that appears to require both written and oral warnings before requesting a breath specimen, other courts have held that the statute allows either oral or written warnings and does not require both. *Tex. Dep't of Public Safety v. Jauregui*, 176 S.W.3d 846, 850–51 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd); *see Rowland v. State*, 983 S.W.2d 58, 60 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (holding that despite statute's plain language that officers must give oral and written warnings *before* requesting breath test, written warning may be given after refusal); *Jessup v. State*, 935 S.W.2d 508, 511 (Tex. App.—Houston [1st Dist.] 1996, pet. ref'd) ("If for some reason [the appellant] did not understand the import of his decision after hearing the warnings orally, he could have changed his mind when he was given

7

the written warnings."); *see also Lane v. State*, 951 S.W.2d 242, 243 (Tex. App.–
–Austin 1997, no pet.) (holding breath test properly admitted though officer never
gave defendant written copy of warnings)*.*

**Appellant could both hear and read.**

The record in this case does not support Appellant's claim that his hearing
was so impaired to require the police to provide a sign-language interpreter to
ensure that he understood the statutory warnings.  To the contrary, the record
shows that Appellant could both hear and read the warnings well enough to
knowingly and voluntarily consent to provide a breath sample.

Noting that Appellant "exhibits some level of hearing impairment" and that
the police did not provide an interpreter, the trial court expressly found that
Appellant "had a fair level of comprehension with regard to the information
contained in the [DIC–24]" and that "[t]hroughout the encounter" he "responded
to instructions of the officer without looking at the officer" by "following instruction,
[and] asking and answering questions."  Our review of the jail video supports the
trial court's findings that Appellant heard and understood the statutory warnings
as Harper read them.  Appellant testified that he removed his hearing aids at the
jail, but our review of the video neither confirms nor refutes this testimony
because Appellant's ears are covered by his hair.  Whether or not Appellant had
his hearing aids in, the video does show that he heard Harper well enough to
respond appropriately to questions and instructions without looking at his face to
lip read.  Upon entering the intoxilyzer room, Appellant leaned against the wall

8

and looked down. But he stopped leaning against it after Harper told him not to. He recited his full name, birth date, and home address and demonstrated that he had nothing in his mouth, all without looking at the officer. Appellant answered "yes" to some of the officer's questions and shook his head "no" after Harper read the *Miranda* warning and asked if he would consent to answer more questions. Further, Appellant testified that he knew to take seven steps on the walk-and-turn test at the jail because he *heard* Harper say seven. In addition, Harper testified that Appellant heard well enough for them to communicate effectively with each other.

Appellant testified that he tried to read the DIC–24 while Harper read it to him but that Harper read very fast and Appellant did not "understand or hear what he said." Appellant also testified that he asked Harper to slow down but did not testify that he ever told him he could not understand. To the contrary, on the video Appellant responded "yes" when, after reading the warnings, Harper asked if Appellant understood them. Further, after Harper had finished reading the warnings, which included a reference to a request for breath and/or blood, Appellant understood enough to ask a question about blood testing.

Deferring as we must to the trial court's resolutions of conflicting testimony, and viewing the evidence in the light most favorable to the trial court's ruling, we hold that the record reasonably supports the trial court's finding that despite exhibiting "some level of hearing impairment," Appellant "had a fair level of comprehension with regard to the information contained in the [DIC–24]."

9

Because the record supports this finding, we hold that Appellant's consent to submit to the breath test was given voluntarily.

Further, the record supports a reasonable finding that Appellant read well enough to understand the consequences of submitting to a breath test as he read along while Harper read the warnings to him. The video shows Appellant following along on his copy of the DIC–24 as Harper read from his, and it shows Appellant confirming when Harper finished reading that they had read the same material. Although one of Appellant's witnesses testified that she rated Appellant's reading at a third or fourth-grade level, she was not an expert on the subject.[5] Appellant himself testified that he had graduated from high school and read "pretty good." Viewed in the light most favorable to the trial court's ruling, the evidence thus supports a reasonable finding that Appellant sufficiently understood the statutory warnings he read to knowingly and voluntarily consent to the breath test.

Given the appropriate standard of review, we hold, therefore, that the trial court did not abuse its discretion in finding that Appellant was sufficiently warned

---

[5]Appellant's expert witness was an experienced certified court interpreter for the deaf, but Appellant's counsel at the suppression hearing conceded that she was not offered "to testify as a scientific expert as to anything." Moreover, the witness admitted that she did not have a degree that qualified her to diagnose reading ability but guessed that Appellant read at "probably a third or fourth grade" level.

of the consequences of providing a specimen of his breath for testing.[6]

Accordingly, we overrule both Appellant's issues on appeal.

## Conclusion

Having overruled Appellant's two issues, we affirm the judgment of the trial court.

          LEE GABRIEL
          JUSTICE

PANEL:  WALKER, MCCOY, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  June 28, 2012

---

[6]Because we hold that the record supports a reasonable finding that Appellant sufficiently understood the DIC–24 warnings, we need not address Appellant's argument that Title II of the ADA required the police to provide Appellant with an interpreter and that the failure to do so rendered Appellant's breath-test results inadmissible.  *See* Tex. R. App. P. 47.1.