02-11-254-CR









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00254-CR


 
 
 Miguel Briones
 
 
  
 
 
 APPELLANT
 
 
 
 
 V.
  
 
 
 
 
 The
 State of Texas
 
 
  
 
 
 STATE
 
 


----------

FROM County
Criminal Court No. 9 OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

Introduction

Appellant
Miguel Briones pled guilty to driving while intoxicated (DWI) after the trial
court denied his motion to suppress results of his breath test.  He reserved the
right to appeal the trial court’s ruling, and he claims that a police officer’s
failure to accommodate his hearing disability when reading the statutory
warning rendered his consent to take the breath test unknowing and involuntary. 
We affirm.

Background
Facts and Procedural History

Arlington
Police Officer Nicholas Harper stopped Appellant in a gas station parking lot around
3:25 a.m.  Appellant wore two “fairly large” hearing aids and at times appeared
to lip read as the officer spoke to him.  Harper determined that Appellant had some
degree of hearing loss but also that, because Appellant appropriately responded
to questions, whatever impairment he had did not prevent the two from effectively
communicating with one another.  Appellant followed Harper’s instructions to produce
his driver’s license and proof of insurance, and he answered questions about how
much he had drunk.  He also appeared to have no difficulty following instructions
on three field-sobriety tests, including the horizontal-gaze nystagmus (HGN),
the walk-and-turn, and the one-leg stand.

After
these tests, Harper arrested Appellant for DWI and took him to jail, escorting
him to a room outfitted with a video camera and breath-testing equipment.  A DVD
video recording admitted at the hearing on Appellant’s suppression motion shows
Appellant leaning against a wall in the room looking down.  When Harper told him
not to lean against the wall, he complied––without lifting his head or having
looked at the officer.  Nor did Appellant look at Harper when asked to state his
“full name,” “date of birth,” and “full home address.”  To each of these, Appellant
responded appropriately without looking up.  Similarly, he responded
appropriately without looking at the officer when asked whether he understood that
he was being videotaped.  Finally, Appellant did not look up or toward the
officer when asked whether he had anything in his mouth but replied “no” and––in
response to Harper’s asking for proof––he stuck out his tongue.

Harper
then instructed Appellant on the walk-and-turn and the one-leg-stand field-sobriety
tests.  For the former, Harper demonstrated three steps and told Appellant to
perform seven.  When Appellant had performed the walk-and-turn earlier at the gas
station, he had taken nine steps, but at the jail he performed seven as Harper
had instructed.  Appellant testified at the suppression hearing that he took seven
steps at the jail because he had heard Harper say the word “seven.”

The
video shows that after Appellant had completed the field sobriety tests, Harper
handed him a document, which no one disputes was a copy of the DIC–24––a form
containing the statutory warnings required before the police may request a
specimen for testing[2]––to
read along with Harper as Harper read the warnings out loud.  As Harper began reading,
Appellant asked him to slow down, and although both Appellant and Harper
testified that Harper did not slow down, our review of the video shows that he may
have slowed somewhat.[3]

In
his brief, Appellant states that he kept asking Harper to slow down.  The
record, however, does not support the implication that he asked more than
once.  Appellant testified that he remembered asking Harper to slow down and
that he did not.  But there was no testimony that Appellant asked multiple
times.  Harper testified that he did not recall Appellant asking him to slow
down, that he did not see Appellant ask him to on the video, and that he did
not, in fact, slow down.  Our review of the video shows that Appellant asked Harper
one time to slow down when he first started reading, and that when the officer
resumed reading, Appellant did not ask again.

After
reading the DIC–24, Harper asked Appellant if he understood what he had read,
and Appellant responded “yes.”  Next, Harper requested a breath test, to which Appellant
said “yes.”

Harper
then read two more forms––one containing Miranda warnings.[4] 
After he had read these to Appellant, Harper asked if Appellant would answer some
questions.  To this, Appellant shook his head “no.”

Harper
repeated the request for a breath sample, and Appellant again said he would
give one.

While
another officer in the room readied the breath-testing equipment, Appellant
asked about a blood test.  The officer replied that a blood sample could not be
taken there and that he would have to go to the hospital for a blood test, and Appellant
appeared to let the matter drop.  Appellant then submitted two breath samples, the
results of which were the subject of his motion to suppress.

Appellant’s
Issue

Appellant
claims that the trial court should have suppressed the breath-test results because
the police did not provide a sign-language interpreter to assist him while
Harper read the DIC–24.  Appellant contends that the failure to provide an interpreter
violated federal and state law, particularly Title II of the Americans with
Disabilities Act (ADA).  We need not address whether the ADA applies in this
case because under the appropriate standard of review, the record supports the
trial court’s express finding that Appellant heard the officer read the DIC–24 well
enough to have knowingly and voluntarily consented to give a breath sample, and
the record also would have supported a finding that Appellant understood the
warning by having read it himself.

Standard
of Review

We
review a trial court’s ruling on a motion to suppress in the light most
favorable to the ruling.  Wiede v. State, 214 S.W.3d 17, 24 (Tex. Crim.
App. 2007); State v. Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). 
When the trial court makes explicit findings of fact, as it did in this case, we
determine whether the evidence, when viewed in the light most favorable to the
trial court’s ruling, supports those findings.  Kelly, 204 S.W.3d at
818–19.  We then review the trial court’s legal ruling de novo unless its
explicit fact findings that are supported by the record are also dispositive of
the legal ruling.  Id. at 818.

We
must uphold the trial court’s ruling if it is supported by the record and
correct under any theory of law applicable to the case even if the trial court
gave the wrong reason for its ruling.  State v. Stevens, 235 S.W.3d 736,
740 (Tex. Crim. App. 2007); Armendariz v. State, 123 S.W.3d 401, 404
(Tex. Crim. App. 2003), cert. denied, 541 U.S. 974 (2004).

The
Statutory Warnings

The
transportation code provides that a person arrested for DWI is deemed to have
consented to providing one or more specimens of the person’s breath or blood
for analysis to determine alcohol concentration or presence of a controlled or
other substance.  Tex. Transp. Code Ann. § 724.011(a) (West 2011).  An adult
person arrested for DWI must be warned that refusal to submit to a breath test
will result in certain consequences, and he must likewise be informed of the
possible consequences if he submits to the test and the results show a
prohibited blood-alcohol level.  See id. § 724.015(1)–(3); State
v. Amaya, 221 S.W.3d 797, 800 (Tex. App.––Fort Worth 2007, pet. ref’d).

A
suspect’s consent to a breath test must be voluntary.  Turpin v. State,
606 S.W.2d 907, 914 (Tex. Crim. App. [Panel Op.] 1980) (applying former version
of section 724.015).  For consent to a breath test to be deemed voluntary, a
suspect’s decision must not be the result of physical pressure or psychological
pressure brought to bear by law enforcement officials.  See Thomas v. State,
723 S.W.2d 696, 704–05 (Tex. Crim. App. 1986) (recognizing that consent to
breath test is not voluntary if induced by physical force or mental coercion); Schafer
v. State, 95 S.W.3d 452, 455 (Tex. App.––Houston [1st Dist.] 2002, pet.
ref’d) (recognizing that consent to breath test is not voluntary if induced by
misstatement of direct statutory consequences of refusal).  A suspect’s
decision to submit to a breath test must be his own, made freely, and with a
correct understanding of the statutory consequences of refusal.  Erdman v.
State, 861 S.W.2d 890, 893 (Tex. Crim. App. 1993).

Substantial
Compliance Standard

This
court has held that warnings given to a DWI suspect need not track the
statutory language verbatim.  Gonzalez v. State, 967 S.W.2d 457, 458
(Tex. App.––Fort Worth 1998, no pet.).  Substantial compliance will suffice so
long as the warnings given do not include extra warnings that are not found in
the statute.  Id.  Despite the statute’s plain language that appears to
require both written and oral warnings before requesting a breath specimen, other
courts have held that the statute allows either oral or written warnings and
does not require both.  Tex. Dep’t of Public Safety v. Jauregui, 176
S.W.3d 846, 850–51 (Tex. App.––Houston [1st Dist.] 2005, pet. ref’d); see
Rowland v. State, 983 S.W.2d 58, 60 (Tex. App.––Houston [1st Dist.] 1998,
pet. ref’d) (holding that despite statute’s plain language that officers must
give oral and written warnings before requesting breath test, written
warning may be given after refusal); Jessup v. State, 935 S.W.2d 508,
511 (Tex. App.––Houston [1st Dist.] 1996, pet. ref’d) (“If for some reason [the
appellant] did not understand the import of his decision after hearing the
warnings orally, he could have changed his mind when he was given the written
warnings.”); see also Lane v. State, 951 S.W.2d 242, 243 (Tex.
App.––Austin 1997, no pet.) (holding breath test properly admitted though
officer never gave defendant written copy of warnings).

Appellant
could both hear and read.

The
record in this case does not support Appellant’s claim that his hearing was so
impaired to require the police to provide a sign-language interpreter to ensure
that he understood the statutory warnings.  To the contrary, the record shows
that Appellant could both hear and read the warnings well enough to knowingly
and voluntarily consent to provide a breath sample.

Noting
that Appellant “exhibits some level of hearing impairment” and that the police
did not provide an interpreter, the trial court expressly found that Appellant “had
a fair level of comprehension with regard to the information contained in the
[DIC–24]” and that “[t]hroughout the encounter” he “responded to instructions
of the officer without looking at the officer” by “following instruction, [and]
asking and answering questions.”  Our review of the jail video supports the
trial court’s findings that Appellant heard and understood the statutory
warnings as Harper read them.  Appellant testified that he removed his hearing
aids at the jail, but our review of the video neither confirms nor refutes this
testimony because Appellant’s ears are covered by his hair.  Whether or not
Appellant had his hearing aids in, the video does show that he heard Harper well
enough to respond appropriately to questions and instructions without looking
at his face to lip read.  Upon entering the intoxilyzer room, Appellant leaned
against the wall and looked down.  But he stopped leaning against it after
Harper told him not to.  He recited his full name, birth date, and home address
and demonstrated that he had nothing in his mouth, all without looking at the
officer.  Appellant answered “yes” to some of the officer’s questions and shook
his head “no” after Harper read the Miranda warning and asked if he
would consent to answer more questions.  Further, Appellant testified that he
knew to take seven steps on the walk-and-turn test at the jail because he heard
Harper say seven.  In addition, Harper testified that Appellant heard well
enough for them to communicate effectively with each other.

Appellant
testified that he tried to read the DIC–24 while Harper read it to him but that
Harper read very fast and Appellant did not “understand or hear what he said.”  Appellant
also testified that he asked Harper to slow down but did not testify that he
ever told him he could not understand.  To the contrary, on the video Appellant
responded “yes” when, after reading the warnings, Harper asked if Appellant
understood them.  Further, after Harper had finished reading the warnings,
which included a reference to a request for breath and/or blood, Appellant understood
enough to ask a question about blood testing.

Deferring
as we must to the trial court’s resolutions of conflicting testimony, and viewing
the evidence in the light most favorable to the trial court’s ruling, we hold
that the record reasonably supports the trial court’s finding that despite
exhibiting “some level of hearing impairment,” Appellant “had a fair level of
comprehension with regard to the information contained in the [DIC–24].” 
Because the record supports this finding, we hold that Appellant’s consent to
submit to the breath test was given voluntarily.

Further,
the record supports a reasonable finding that Appellant read well enough to
understand the consequences of submitting to a breath test as he read along
while Harper read the warnings to him.  The video shows Appellant following
along on his copy of the DIC–24 as Harper read from his, and it shows Appellant
confirming when Harper finished reading that they had read the same material.  Although
one of Appellant’s witnesses testified that she rated Appellant’s reading at a
third or fourth-grade level, she was not an expert on the subject.[5] 
Appellant himself testified that he had graduated from high school and read
“pretty good.”  Viewed in the light most favorable to the trial court’s ruling,
the evidence thus supports a reasonable finding that Appellant sufficiently understood
the statutory warnings he read to knowingly and voluntarily consent to the
breath test.

Given
the appropriate standard of review, we hold, therefore, that the trial court
did not abuse its discretion in finding that Appellant was sufficiently warned
of the consequences of providing a specimen of his breath for testing.[6] 
Accordingly, we overrule both Appellant’s issues on appeal.

Conclusion

Having
overruled Appellant’s two issues, we affirm the judgment of the trial court.

 

 

LEE GABRIEL

JUSTICE

 

PANEL:  WALKER,
MCCOY, and GABRIEL, JJ.

DO
NOT PUBLISH

Tex.
R. App. P. 47.2(b)

 

DELIVERED:  June 28, 2012









[1]See Tex. R. App. P. 47.4.





[2]See Tex. Transp.
Code. Ann. § 724.015 (West Supp. 2011).





[3]If he did, though, it was
not by much.





[4]See Miranda v. Arizona,
384 U.S. 436, 444–45, 86 S. Ct. 1602, 1612 (1966).





[5]Appellant’s expert witness
was an experienced certified court interpreter for the deaf, but Appellant’s
counsel at the suppression hearing conceded that she was not offered “to
testify as a scientific expert as to anything.”  Moreover, the witness admitted
that she did not have a degree that qualified her to diagnose reading ability
but guessed that Appellant read at “probably a third or fourth grade” level.





[6]Because we hold that the
record supports a reasonable finding that Appellant sufficiently understood the
DIC–24 warnings, we need not address Appellant’s argument that Title II of the
ADA required the police to provide Appellant with an interpreter and that the
failure to do so rendered Appellant’s breath-test results inadmissible.  See
Tex. R. App. P. 47.1.