Opinion filed October 29, 2009











 
 
  
 
 







 
 
  
 
 




Opinion filed October 29, 2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                  ___________

 

                                                          No. 11-07-00297-CR

                                                    __________

 

                                    RONNIE DAVENPORT, Appellant

 

                                                             V.

 

                                         STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 235th District Court

 

                                                          Cooke
County, Texas

 

                                                   Trial
Court Cause No. 06-186

 



 

                                                                   O
P I N I O N

The
jury convicted Ronnie Davenport of possession of certain chemicals with the
intent to manufacture a controlled substance and assessed her punishment at
confinement for eight years.  We affirm.

Appellant
briefs two points of error on appeal.  First, appellant contends that the trial
court erred by denying her motion to suppress.  Appellant argues that
Gainesville Police Officer Gary Brown lacked sufficient probable cause for the
stop and, therefore, for the subsequent seizure of evidence.








A
trial court=s denial
of a motion to suppress is reviewed for an abuse of discretion.  Balentine
v. State, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); Caraway v. State,
255 S.W.3d 302,

307 (Tex. App.CEastland 2008, no pet.). 
In reviewing a trial court=s
ruling, an appellate court must view the evidence in the light most favorable
to the trial court=s
ruling.  State v. Kelly, 204 S.W.3d
808, 818 (Tex. Crim. App. 2006).   Great deference must be given to the trial
court=s findings of historical facts as long as the record
supports the findings. Torres v. State, 182 S.W.3d 899, 902 (Tex. Crim.
App. 2005); Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). 
Further, the reviewing court must also give deference to the trial court=s rulings on mixed questions of law and fact when those rulings turn on
an evaluation of credibility and demeanor.  Guzman, 955 S.W.2d at
89.  Where such rulings do not turn on an evaluation of credibility and
demeanor, the appellate court reviews the trial court=s actions de novo.  Id.

At
the hearing on the motion to suppress, Officer Brown testified that he received
a message over the mobile data center in his vehicle from Gainesville Police
Department Dispatcher Joseph Foreman Jr. that Foreman had observed the purchase
of a Alarge amount@ of Sudafed from a Runnin= Reds convenience store. 
Foreman described the vehicle in which the parties were riding as a black,
four-door Saturn with Oklahoma license plates AVictor
Paul Charles 074.@ 
Foreman further informed Officer Brown that the purchase was made by a female;
that there were two people, including the female, in the vehicle; and that they
were sitting in the vehicle on the west side of the parking lot.

Officer
Brown was suspicious because of the large purchase of Sudafed or
pseudoephedrine and because the buyer remained seated in the vehicle.  Officer
Brown testified that he was familiar with the clandestine manufacture of
methamphetamine and that pseudoephedrine was an ingredient used in the
process.  Based on that knowledge and his belief that Foreman was a credible
witness, Officer Brown went to the convenience store.  As he approached, the
driver of the vehicle drove off.  Officer Brown turned his emergency lights on
to stop the vehicle.








Appellant
was the driver, and Tommy Holder was the passenger.  Officer Brown stated that,
when he asked appellant if she had any Sudafed in the vehicle, she said that
she did not know.  Officer Brown told appellant that he had received
information that she had made a large purchase of Sudafed.  Holder handed
Officer Brown a cup containing Acrushed
up pills@ and told the
officer that the medication was in the cup.  Holder then gave Officer Brown
consent to search.  Appellant told the officer that she had made the purchase
and that she was being paid $200 to buy the Sudafed and transport it to
Oklahoma.

Officer
Brown testified that he did not tell either appellant or Holder that, if they
failed to consent, he could hold them for up to seventy-two hours.  Officer
Brown did not recall if appellant said that she wanted to call an attorney. 
Neither appellant nor Holder were arrested that evening.

Gainesville
Police Officer James Birdsell testified that he received the message from
Foreman that he had observed someone purchase a large amount of pseudoephedrine
or Sudafed at the Runnin=
Reds store.  He was in a different police car than Officer Brown, and he also
responded.  Officer Brown talked to appellant while Officer Birdsell talked to
Holder.  

Officer
Birdsell saw Holder hand Officer Brown a Sonic cup.  Holder advised Officer
Brown what was in the cup.  Then, Holder signed a consent to search form. 
Officer Birdsell did not recall any statements that the officers could hold
appellant and Holder for up to seventy-two hours if they did not consent.

Holder
testified that he and appellant went first to the Runnin= Reds store and then to the Sonic.  He and
appellant each purchased two bottles of  Max brand pills at the Runnin= Reds.  He stated that they
were unable to purchase the medicine in Oklahoma.  They left the Sonic and were
headed home to Wayne, Oklahoma, when the police arrived.  Holder thought there
were three police cars behind and beside them.  Holder testified that he and
appellant were in his mother=s
vehicle.

When
the officer approached, appellant told them that it was not her car and that
she did not feel she could give consent to search.  Holder did not recall
signing the consent form and did not recall the officers asking about the
purchase of Sudafed.  Holder did recall that the officers said that Awe could either tell them
where the stuff was or they would detain us for 72 hours in jail and we wouldn=t be able to get back to
our kids that night.@ 
Holder stated that, after the officers made that statement, he Ajust handed them the cup.@  Holder further testified
that he Amust have@ voluntarily consented but
he did not remember doing so.  He also testified that neither he nor appellant
told the officers that they were being paid to drive to Gainesville to purchase
pseudoephedrine.








The
trial court did not abuse its discretion in denying  the motion to suppress. 
The record supports the trial court=s
conclusion that the officers acted with sufficient probable cause. 
Officer Brown testified that his actions were based on his training as to
the illegal manufacture of methamphetamine and his belief that the Gainesville
Police Department dispatcher was a credible witness.  Both Officer Brown and
Officer Birdsell testified that Holder handed the cup containing the crushed
pseudoephedrine pills to Officer Brown voluntarily.  Holder signed a consent to
search form.  The first point is overruled.

In
her second point, appellant contends that the evidence is both legally and
factually insufficient.  Appellant argues that there is Ano question [that she] possessed a reasonably
small quantity of medication containing a moderately small amount of
pseudoephedrine.@ 
However, she maintains that she gave explanations for both the purchase of the
medication and the  presence of the medicine in the Sonic cup.  Appellant
contends that her explanations were uncontroverted and that there was nothing
to establish intent to manufacture methamphetamine on her part.

 In
order to determine if the evidence is legally sufficient, the appellate court 
reviews all of the evidence in the light most favorable to the verdict and determines
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307,
319 (1979); Laster v. State, 275 S.W.3d 512, 517-18 (Tex. Crim. App.
2009); Jackson v. State, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000).  To
determine if the evidence is factually sufficient, the appellate court reviews
all of the evidence in a neutral light.  Laster, 275 S.W.3d at 519;
Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Johnson v.
State, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); Cain v. State, 958
S.W.2d 404, 407-08 (Tex. Crim. App. 1997); Clewis v. State, 922 S.W.2d
126, 129 (Tex. Crim. App. 1996).  Then, the reviewing court determines whether
the evidence supporting the verdict is so weak that the verdict is clearly
wrong and manifestly unjust or whether the verdict is against the great weight
and preponderance of the conflicting evidence.  Watson, 204 S.W.3d at
414-15; Johnson, 23 S.W.3d at 10-11.








The
appellate court reviews the factfinder=s
weighing of the evidence and cannot substitute its judgment for that of the
factfinder.  Cain, 958 S.W.2d at 407; Clewis, 922 S.W.2d at 133. 
Due deference must be given to the factfinder=s
determination, particularly concerning the weight and credibility of the
evidence.  Johnson, 23 S.W.3d at 9; Jones v. State, 944 S.W.2d
642 (Tex. Crim. App. 1996).  While the verdict is afforded less deference under
a factual sufficiency review, the appellate court is not free to override the
verdict simply because the appellate court disagrees with it.  Laster,
275 S.W.3d at 520.

At
the time of the offense on May 18, 2005, Tex.
Health & Safety Code ' 481.124(b)(3)
(2003) provided that a person committed the offense if, with the intent to
unlawfully manufacture a controlled substance, the person possessed a chemical
precursor.  On  August 1, 2005, less than three months after the offense, the
provisions of Tex. Health & Safety
Code Ann. '' 486.001B.033  (Vernon Supp. 2009)
regulating the sale of pseudoephedrine became effective.

It
is undisputed that appellant and Holder drove from Wayne, Oklahoma, to Texas;
that Wayne, Oklahoma, was more than ninety miles from Gainesville; and that
appellant was aware that she could not make such a purchase in Oklahoma.  As
appellant argues, the amount of pseudoephedrine purchased as well as the intent
with which it was possessed was disputed.

At
trial, Foreman testified that he was in line to make a purchase at a Runnin= Reds convenience store
around 11:40 p.m. when the woman in front of him purchased three bottles of
sixty-count pseudoephedrine tablets.  Foreman stated that, in his training with
the police department, he was privy to the same information as the police
officers concerning Asubstances
and things like that.@ 
Based on this training, he was suspicious of appellant=s purchase of 180 tablets of pseudoephedrine. 
Foreman watched appellant leave the store.  A man was standing outside. 
Appellant got in on the driver=s
side of a vehicle parked directly in front of the store door, and the man got
in on the passenger=s
side.  Appellant handed the man the bottles of pseudoephedrine and then drove
the vehicle to the northeast corner of the store=s
parking lot.

Foreman
took down the license plate of the vehicle and waited for appellant to drive
out of the parking lot.  After she left, Foreman went to the police station and
informed the officers on duty what he had seen.

On
cross-examination, Foreman stated that, while he used the brand name Sudafed to
describe the bottles of pseudoephedrine, the bottles that appellant purchased
were actually a different brand of pseudoephedrine.  Foreman also stated that
he looked at the bottles appellant had and that each bottle contained sixty
tablets.








Officer
Brown testified that, based on information provided by Foreman, he drove to the
Runnin= Reds around
11:45 p.m. looking for a black, four-door Saturn vehicle with Oklahoma license
plates.  Officer Brown saw the vehicle parked with two people inside.  As he
arrived, the vehicle left.  Officer Brown was aware that pseudoephedrine was
used in the illegal manufacture of methamphetamine and decided to stop the
vehicle to investigate.

Officer
Brown testified that Holder was the passenger in the car and appellant was
driving.  When Officer Brown told them that a dispatcher had observed them
making a large purchase of Sudafed at the Runnin=
Reds store, they denied making such a purchase.  Officer Brown said that he
asked for consent to search and that Holder handed him a Sonic cup.  The cup
contained Acrushed up
pseudoephedrine pills.@ 
Appellant told Officer Brown that she had purchased the Sudafed and that she
was going to be paid $200 to transport it to Oklahoma.  Officer Brown found
three more pills in the passenger seat.

On
cross-examination, Officer Brown stated that, when he first asked appellant
about the purchase, he used the brand name Sudafed to describe the
pseudoephedrine tablets.  She denied purchasing Sudafed.  Toward the middle of
the interview, Officer Brown stated that appellant used the brand name Sudafed
to describe the tablets she had purchased.  Officer Brown also stated that no
containers for the pseudoephedrine tablets were found and that neither
appellant nor Holder indicated that they had purchased the pseudoephedrine with
the intent to manufacture methamphetamine.  He did not make an arrest and
allowed the two to continue on to Oklahoma.

On
redirect, Officer Brown stated that he did not know what appellant and Holder
were going to do with the cup of crushed pseudoephedrine tablets but that he
speculated they would use the crushed tablets for some sort of criminal
activity.  Officer Brown stated that he did not participate in the follow-up
investigation.

Officer
Birdsell testified that he had received training with regard to clandestine
labs that manufactured methamphetamine.  Pseudoephedrine was both a necessary
ingredient of and a precursor to methamphetamine.  Based on a report from the
dispatcher who was in the Runnin=
Reds store, Officer Birdsell stated that he was patrolling the streets looking
for a black car near the store.  Officer Birdsell saw the car in the store
parking lot.  Appellant was the driver.

Officer
Birdsell saw Holder give Officer Brown a Sonic cup.  Inside the cup were Anumerous pseudoephedrine
tablets.@  Consent was
given to search, and the officers found no packaging for the pseudoephedrine
tablets.








On
cross-examination, Officer Birdsell stated that he talked to appellant.  She
told him that she was going to be paid $200 when she returned to Oklahoma with
the pseudoephedrine.  She told him that she was selling the tablets to a truck
driver.  Officer Birdsell testified that the amount appellant had was Atoo much@ to be Afor personal use.@  Officer Birdsell also
stated that he thought they had violated the law against the purchasing of a
precursor for the production of methamphetamine.

On
redirect, Officer Birdsell testified that appellant told him she was buying the
pseudoephedrine for Carroll Price of Wayne, Oklahoma.

Kaye
Davis, a chemist with the Garland Texas Department of Public Safety crime
laboratory, testified that she had training with the Drug Enforcement
Administration in the operation of clandestine laboratories and had been
working with investigations of clandestine laboratories since 1979. Davis
stated that pseudoephedrine was the Aprincipal
ingredient@ in making
methamphetamine illegally.  The ANazi@ method and the ARed P@ method were the most
common methods used.  In both methods, pseudoephedrine was the precursor and,
therefore, was the main ingredient to the illegal manufacture of
methamphetamine.  Davis stated that pseudoephedrine was found in over the
counter medicines such as Sudafed.  Davis described the process for each
method.  For each method, the pseudoephedrine must first be broken into a fine
powder.  Then, the Abinders@ in the Sudafed or
pseudoephedrine would need to be removed to ensure a more efficient chemical
reaction in the remaining process.

Davis
testified that the discovery of crushed pseudoephedrine pills would indicate to
her that the process of illegal manufacture of methamphetamine had begun. 
Davis identified the substance from the Sonic cup as pseudoephedrine and stated
that it weighted 30.12 grams.

Gainesville
Police Investigator Timothy Green also testified concerning the manufacture of
methamphetamine.  Investigator Green stated that the first step was to grind up
the pseudoephedrine.  In this case, Investigator Green stated that the
pseudoephedrine in the Sonic cup was Amashed
up and appeared to be in a dissolving process.@ 
Investigator Green further testified that, in his experience and training, he
knew of no other reason to possess the amount and condition of pseudoephedrine
in the Sonic cup other than to manufacture methamphetamine.








Appellant
testified that she lived in Oklahoma and had worked off and on for her mother
in her mother=s
convenience store in Wayne, Oklahoma.  While her sister used methamphetamine
and had been involved with methamphetamine labs, appellant stated that, because
of her sister=s
experiences, she had never used methamphetamine and had never intended to
manufacture methamphetamine.

Around
noon on the day in question, she and Holder had gone to play cassino-type bingo
about seven miles from where she lived.  She won almost $700.  Between 2 - 3
p.m., she and Holder had decided to drive to Texas to go shopping and to see
her cousin.  Holder was driving when they were pulled over for speeding in
Denton.  They never made it to her cousin=s
house in Flower Mound because her cousin was called out to work as an
anesthesiologist.  They mostly Awindow
shopped@ and arrived
in Gainesville about 11:45 p.m.

They
stopped at the Sonic to get something to drink and then went to the Runnin= Reds to get gas.  While
she was in the store, appellant saw the Max brand bottles of pseudoephedrine. 
The bottles contained thirty-six 60 mg tablets.  Appellant testified that she
could not buy the Max brand in Oklahoma because they had been Apulled off of the shelf.@  Truck drivers bought the
medicine from her mother=s
store.  Appellant testified that she thought she could make a profit by buying
the tablets in Texas and reselling them at her mother=s store. 

Appellant
attempted to purchase four bottles containing thirty-six pills; however, the
clerk told her that she could only buy two bottles.  She bought two bottles,
and then Holder purchased two more.  When they got to the car, they combined
the contents of all four bottles into one bottle and threw away the three empty
bottles.  Appellant stated that her intent was to sell the pills for a profit
and not to manufacture methamphetamine.  They poured the pills into one bottle
because it was more convenient, and she did not want to have four bottles Arolling around in [her]
purse.@  Appellant
stated that she believed the pills were illegal in Oklahoma.








When
they saw the police cars, appellant testified that she assumed the police Awere there  for her.@  She pulled over
immediately.  She was scared and was afraid that she had done something
illegal.  She thought that the clerk had made a mistake and sold them too much
of the pseudoephedrine.  Holder poured half of the pills into the Sonic cup
because they believed it was legal to have two bottles of the pseudoephedrine. 
Appellant stated that she had told Holder to Adump
and conceal@ the pills
in the Sonic cup.

When
the officer first asked if she had bought Sudafed, she replied that she had not
bought Sudafed.  When she told the officer that he could not search the car,
the officer did not allow her to call an attorney friend and told her that they
did not need consent to search.  The officers said that they Acould do it either the easy
way or the hard way.@ 
When the officers only found a couple of loose tablets, appellant stated that
they became irate.  The officers wanted to remove the door panels of the
vehicle.  Because this was Holder=s
mother=s vehicle,
appellant asked if she could call Holder=s
mother.  The officers said that she could not.  Appellant was beginning to
worry about her two boys who were at her home in Oklahoma alone.  She was also
worried about going to jail.  All of this happened before Holder signed a
consent form.

When
Holder asked her what he should do with the Sonic cup, appellant testified that
she told Holder to do whatever he wanted to with it.  Holder then handed the
cup to the officers.  Appellant testified that the officers had to pour out the
drink and the ice to find where the pills had already melted.

The
officers allowed them to leave, and they drove home to Wayne, Oklahoma.  The
next day, she told Wayne City Police Officer Ron Reagan about the incident.

Appellant
emphasized that her intent was to purchase the pseudoephedrine to sell for a
profit to truck drivers at her mother=s
store in Oklahoma.  She did not intend to manufacture or to sell it to someone
who intended to manufacture methamphetamine.  Appellant stated that she told
the officers that she had come to Texas to buy the Max brand for her mother to
resell in Oklahoma at her store.

Holder
testified that, around 7:00 or 8:00 p.m., they left Oklahoma to come to Texas
to visit appellant=s
cousin.  They went Ato
bingo farting around on the way.@ 
When they were in Gainesville, appellant went into the store first to buy all
the Max brand pills that she could.  He went in after her.  They each bought
two bottles, and each bottle contained thirty-six pills.  They had no intent to
manufacture methamphetamine.  They bought the pills for appellant to sell to
truck drivers at her mother=s
store.  They took all the pills from the four bottles and poured them into one
bottle.  Holder stated that that was how appellant Ahad done it before.@  They threw the other bottles in the trash. 








Holder
first noticed the officers when they were leaving the Sonic.  He stated that
the police cars were Ajust
coming out from everywhere like we=d
just robbed a bank or something.@ 
The police Ascared
[him] to death,@ and
he knew that something was going on.  They were not speeding, and the only
other thing they had done in Gainesville was to go to the Sonic.  Holder
testified that he A[j]ust
freaked completely out@
and poured the pills into the Sonic cup.

Holder
testified that he had never been pulled over by two or three officers and that
he did not know what to do.  He did not remember signing a consent to search
form.  They told the officers that they had children asleep at home and that
they had borrowed his mother=s
car.  He also told the officers that no one really knew they were in
Gainesville.

Holder
testified that he gave the officers the Sonic cup after the officers described
how they were going to Aget
rough@ with appellant
and him.  The officers were upset with them and were Akind of p----d off when they looked all over
the car and didn=t
find the pills that they supposedly had sat and watched us get.@  Holder stated that they
had no intent to use or let someone else use the pseudoephedrine to manufacture
methamphetamine.

The
jury, as the finder of fact, was the sole judge of the weight and credibility
of the witnesses=
testimony.  Tex. Code Crim.
Proc. Ann. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979).  This
court has the authority to disagree with the factfinder=s determination Aonly
when the record clearly indicates such a step is necessary to arrest the
occurrence of a manifest injustice.@ 
Johnson, 23 S.W.3d at 9.  Circumstantial evidence of intent must be
reviewed with the same scrutiny as any other element of the offense.  Laster,
275 S.W.3d at 519-20.








After
reviewing the record in the light most favorable to the verdict, we find that
the evidence is legally sufficient.  A reasonable jury could have concluded
that appellant committed the offense.  A reasonable jury could have inferred
appellant=s intent to
involve the pseudoephedrine in the manufacture of methamphetamine from her
actions of purchasing the pills in Texas when she believed it was illegal to do
so in her home state, of removing the pills from the original packaging even
though she testified that she planned to resell them in her home state, and of
disposing of the original packaging as well as the crushing and placement of
the pills in the Sonic cup.  This  evidence together with the expert testimony
concerning pseudoephedrine as the key ingredient in and as the precursor to
methamphetamine, the testimony concerning the methods for manufacturing
methamphetamine, the expert testimony that the crushed pseudoephedrine in the
Sonic cup appeared to be in the first stage of manufacturing for
methamphetamine, and the expert testimony that the amount of 30.12 grams of
medicine was more than what was appropriate for personal use is legally
sufficient to support the jury=s
determination.  

Likewise,
when the evidence is reviewed in a neutral light, we find that there is
factually sufficient evidence to support the verdict.  While appellant and
Holder denied any intent to manufacture methamphetamine, there were
inconsistencies in their testimony about the events of that day.  A rational
jury could consider these inconsistencies when it determined the weight and
credibility of all of the evidence.  We do not find that the evidence
supporting the verdict is so weak that the verdict is clearly wrong and
manifestly unjust or that the verdict is against the great weight and
preponderance of the conflicting evidence.  The second point is overruled.

The
judgment of the trial court is affirmed.

 

 

JIM R. WRIGHT

CHIEF JUSTICE

 

October 29, 2009

Publish.  See
Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Hill, J.[1]








Opinion
filed October 29, 2009

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of
Appeals

                                                                    __________

 

                                                          No. 11-07-00297-CR

                                                       ________

 

                                   RONNIE
DAVENPORT, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                            On Appeal from
the 235th District Court

 

                                                            Cooke
County, Texas

 

                                                      Trial
Court Cause No. 06-186

 



 

                                                   D
I S S E N T I N G   O P I N I O N

I respectfully
dissent because the evidence is legally insufficient to support the
conviction.  Ronnie Davenport=s conviction is for possession of
pseudoephedrine with the intent to manufacture methamphetamine.  The State
showed that Davenport possessed pseudoephedrine and that, by causing it to be
put in a soft drink, produced a substance consistent with that produced in the
early stages of the manufacturing of methamphetamine.  One witness testified
that there was no other reason to possess the amount of pseudoephedrine in a
cup of Coca-Cola other than to manufacture methamphetamine.  








It is generally
understood that methamphetamine is manufactured at methamphetamine labs, with
the use of other chemical precursors.  In all cases of which I am aware,
convictions of this offense have been obtained by showing the defendant=s possession of
other precursors or the defendant=s connection with
methamphetamine labs.  

            In
this case, there is no showing that Davenport was in possession of any other
precursor used in the manufacture of methamphetamine and no showing of any
connection between her and any methamphetamine lab.  Instead, the theory
appears to be that she and her companion, Tommy Holder, put the pseudoephedrine
tablets in a cup of Coca-Cola with the intention of beginning the process of
manufacturing methamphetamine.   

I would agree that
the evidence is sufficient to show that Davenport intended that the
pseudoephedrine be put in the cup of Coca-Cola.  I would agree that there is
evidence from which a reasonable jury could conclude that the result is
equivalent or similar to that obtained in the early manufacture of
methamphetamine.  What is missing is any evidence from which it might
reasonably be inferred that Davenport intended, by having the pseudoephedrine
placed into the Coca-Cola, to begin the process of manufacturing
methamphetamine.

Juries may make
inferences that are supported by the evidence at trial but are not permitted to
come to conclusions based on mere speculation or factually unsupported
inferences or presumptions.  Hooper v. State, 214 S.W.3d 9, 15 (Tex.
Crim. App. 2007).  Because it is not generally understood that mixing
pseudoephedrine with Coca-Cola produces something that can be compared to the
beginning of the process of manufacturing methamphetamine or that the
manufacture of methamphetamine occurs outside of methamphetamine labs, a
finding that Davenport intended to begin the process of manufacturing
methamphetamine by mixing pseudoephedrine with Coca-Cola, outside of the
context of a methamphetamine lab, is an inference based on mere speculation and
is factually unsupported.  It is based upon the supposition that she must have
special knowledge by which she would know that the mixing of the two outside
the context of a methamphetamine lab would constitute the beginning of the
process of manufacturing methamphetamine.  There was no showing of any special
knowledge Davenport possessed by which she would know that her action would
result in the manufacture of methamphetamine or that methamphetamine could be
manufactured outside of the context of a methamphetamine lab. Consequently, any
inference that by mixing the two, Davenport intended that result would be
unreasonable, absent her possession of another precursor besides
methamphetamine, a connection to a methamphetamine lab, or evidence that she
possessed special knowledge of the process of manufacturing methamphetamine.








I would sustain
Davenport=s second point on appeal, reverse the judgment, and
remand to the trial court for the purpose of the entry of a judgment of
acquittal.   

 

 

JOHN
G. HILL

JUSTICE

 

October 29, 2009

Publish.  See Tex. R. App. P. 47.2(b).

Panel consists of:  Wright, C.J.,

McCall, J., and Hill, J.[2]

 

 









[1]John G. Hill, Former Justice, Court of Appeals, 2nd
District of Texas at Fort Worth, sitting by assignment.





[2]John G. Hill, Former Justice, Court of Appeals, 2nd
District of Texas at Fort Worth, sitting by assignment.