

In The

# Eleventh Court of Appeals

———————

## No. 11-07-00297-CR

———————

**RONNIE DAVENPORT, Appellant**

**V.**

**STATE OF TEXAS, Appellee**

**On Appeal from the 235th District Court**

**Cooke County, Texas**

**Trial Court Cause No. 06-186**

**O P I N I O N**

The jury convicted Ronnie Davenport of possession of certain chemicals with the intent to manufacture a controlled substance and assessed her punishment at confinement for eight years. We affirm.

Appellant briefs two points of error on appeal. First, appellant contends that the trial court erred by denying her motion to suppress. Appellant argues that Gainesville Police Officer Gary Brown lacked sufficient probable cause for the stop and, therefore, for the subsequent seizure of evidence.

A trial court's denial of a motion to suppress is reviewed for an abuse of discretion. *Balentine v. State*, 71 S.W.3d 763, 768 (Tex. Crim. App. 2002); *Caraway v. State*, 255 S.W.3d 302, 307 (Tex. App.—Eastland 2008, no pet.). In reviewing a trial court's ruling, an appellate court must view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). Great deference must be given to the trial court's findings of historical facts as long as the record supports the findings. *Torres v. State*, 182 S.W.3d 899, 902 (Tex. Crim. App. 2005); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). Further, the reviewing court must also give deference to the trial court's rulings on mixed questions of law and fact when those rulings turn on an evaluation of credibility and demeanor. *Guzman*, 955 S.W.2d at 89. Where such rulings do not turn on an evaluation of credibility and demeanor, the appellate court reviews the trial court's actions de novo. *Id.*

At the hearing on the motion to suppress, Officer Brown testified that he received a message over the mobile data center in his vehicle from Gainesville Police Department Dispatcher Joseph Foreman Jr. that Foreman had observed the purchase of a "large amount" of Sudafed from a Runnin' Reds convenience store. Foreman described the vehicle in which the parties were riding as a black, four-door Saturn with Oklahoma license plates "Victor Paul Charles 074." Foreman further informed Officer Brown that the purchase was made by a female; that there were two people, including the female, in the vehicle; and that they were sitting in the vehicle on the west side of the parking lot.

Officer Brown was suspicious because of the large purchase of Sudafed or pseudoephedrine and because the buyer remained seated in the vehicle. Officer Brown testified that he was familiar with the clandestine manufacture of methamphetamine and that pseudoephedrine was an ingredient used in the process. Based on that knowledge and his belief that Foreman was a credible witness, Officer Brown went to the convenience store. As he approached, the driver of the vehicle drove off. Officer Brown turned his emergency lights on to stop the vehicle.

Appellant was the driver, and Tommy Holder was the passenger. Officer Brown stated that, when he asked appellant if she had any Sudafed in the vehicle, she said that she did not know. Officer Brown told appellant that he had received information that she had made a large purchase of Sudafed. Holder handed Officer Brown a cup containing "crushed up pills" and told the officer

2

that the medication was in the cup. Holder then gave Officer Brown consent to search. Appellant told the officer that she had made the purchase and that she was being paid $200 to buy the Sudafed and transport it to Oklahoma.

Officer Brown testified that he did not tell either appellant or Holder that, if they failed to consent, he could hold them for up to seventy-two hours. Officer Brown did not recall if appellant said that she wanted to call an attorney. Neither appellant nor Holder were arrested that evening.

Gainesville Police Officer James Birdsell testified that he received the message from Foreman that he had observed someone purchase a large amount of pseudoephedrine or Sudafed at the Runnin' Reds store. He was in a different police car than Officer Brown, and he also responded. Officer Brown talked to appellant while Officer Birdsell talked to Holder.

Officer Birdsell saw Holder hand Officer Brown a Sonic cup. Holder advised Officer Brown what was in the cup. Then, Holder signed a consent to search form. Officer Birdsell did not recall any statements that the officers could hold appellant and Holder for up to seventy-two hours if they did not consent.

Holder testified that he and appellant went first to the Runnin' Reds store and then to the Sonic. He and appellant each purchased two bottles of Max brand pills at the Runnin' Reds. He stated that they were unable to purchase the medicine in Oklahoma. They left the Sonic and were headed home to Wayne, Oklahoma, when the police arrived. Holder thought there were three police cars behind and beside them. Holder testified that he and appellant were in his mother's vehicle.

When the officer approached, appellant told them that it was not her car and that she did not feel she could give consent to search. Holder did not recall signing the consent form and did not recall the officers asking about the purchase of Sudafed. Holder did recall that the officers said that "we could either tell them where the stuff was or they would detain us for 72 hours in jail and we wouldn't be able to get back to our kids that night." Holder stated that, after the officers made that statement, he "just handed them the cup." Holder further testified that he "must have" voluntarily consented but he did not remember doing so. He also testified that neither he nor appellant told the officers that they were being paid to drive to Gainesville to purchase pseudoephedrine.

The trial court did not abuse its discretion in denying the motion to suppress. The record supports the trial court's conclusion that the officers acted with sufficient probable cause.

3

Officer Brown testified that his actions were based on his training as to the illegal manufacture of methamphetamine and his belief that the Gainesville Police Department dispatcher was a credible witness. Both Officer Brown and Officer Birdsell testified that Holder handed the cup containing the crushed pseudoephedrine pills to Officer Brown voluntarily. Holder signed a consent to search form. The first point is overruled.

In her second point, appellant contends that the evidence is both legally and factually insufficient. Appellant argues that there is "no question [that she] possessed a reasonably small quantity of medication containing a moderately small amount of pseudoephedrine." However, she maintains that she gave explanations for both the purchase of the medication and the presence of the medicine in the Sonic cup. Appellant contends that her explanations were uncontroverted and that there was nothing to establish intent to manufacture methamphetamine on her part.

In order to determine if the evidence is legally sufficient, the appellate court reviews all of the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster v. State*, 275 S.W.3d 512, 517-18 (Tex. Crim. App. 2009); *Jackson v. State*, 17 S.W.3d 664, 667 (Tex. Crim. App. 2000). To determine if the evidence is factually sufficient, the appellate court reviews all of the evidence in a neutral light. *Laster*, 275 S.W.3d at 519; *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); *Johnson v. State*, 23 S.W.3d 1, 10-11 (Tex. Crim. App. 2000); *Cain v. State*, 958 S.W.2d 404, 407-08 (Tex. Crim. App. 1997); *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996). Then, the reviewing court determines whether the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or whether the verdict is against the great weight and preponderance of the conflicting evidence. *Watson*, 204 S.W.3d at 414-15; *Johnson*, 23 S.W.3d at 10-11.

The appellate court reviews the factfinder's weighing of the evidence and cannot substitute its judgment for that of the factfinder. *Cain*, 958 S.W.2d at 407; *Clewis*, 922 S.W.2d at 133. Due deference must be given to the factfinder's determination, particularly concerning the weight and credibility of the evidence. *Johnson*, 23 S.W.3d at 9; *Jones v. State*, 944 S.W.2d 642 (Tex. Crim. App. 1996). While the verdict is afforded less deference under a factual sufficiency review, the

appellate court is not free to override the verdict simply because the appellate court disagrees with it. *Laster*, 275 S.W.3d at 520.

At the time of the offense on May 18, 2005, TEX. HEALTH & SAFETY CODE § 481.124(b)(3) (2003) provided that a person committed the offense if, with the intent to unlawfully manufacture a controlled substance, the person possessed a chemical precursor. On August 1, 2005, less than three months after the offense, the provisions of TEX. HEALTH & SAFETY CODE ANN. §§ 486.001–.033 (Vernon Supp. 2009) regulating the sale of pseudoephedrine became effective.

It is undisputed that appellant and Holder drove from Wayne, Oklahoma, to Texas; that Wayne, Oklahoma, was more than ninety miles from Gainesville; and that appellant was aware that she could not make such a purchase in Oklahoma. As appellant argues, the amount of pseudoephedrine purchased as well as the intent with which it was possessed was disputed.

At trial, Foreman testified that he was in line to make a purchase at a Runnin' Reds convenience store around 11:40 p.m. when the woman in front of him purchased three bottles of sixty-count pseudoephedrine tablets. Foreman stated that, in his training with the police department, he was privy to the same information as the police officers concerning "substances and things like that." Based on this training, he was suspicious of appellant's purchase of 180 tablets of pseudoephedrine. Foreman watched appellant leave the store. A man was standing outside. Appellant got in on the driver's side of a vehicle parked directly in front of the store door, and the man got in on the passenger's side. Appellant handed the man the bottles of pseudoephedrine and then drove the vehicle to the northeast corner of the store's parking lot.

Foreman took down the license plate of the vehicle and waited for appellant to drive out of the parking lot. After she left, Foreman went to the police station and informed the officers on duty what he had seen.

On cross-examination, Foreman stated that, while he used the brand name Sudafed to describe the bottles of pseudoephedrine, the bottles that appellant purchased were actually a different brand of pseudoephedrine. Foreman also stated that he looked at the bottles appellant had and that each bottle contained sixty tablets.

Officer Brown testified that, based on information provided by Foreman, he drove to the Runnin' Reds around 11:45 p.m. looking for a black, four-door Saturn vehicle with Oklahoma

license plates. Officer Brown saw the vehicle parked with two people inside. As he arrived, the vehicle left. Officer Brown was aware that pseudoephedrine was used in the illegal manufacture of methamphetamine and decided to stop the vehicle to investigate.

Officer Brown testified that Holder was the passenger in the car and appellant was driving. When Officer Brown told them that a dispatcher had observed them making a large purchase of Sudafed at the Runnin' Reds store, they denied making such a purchase. Officer Brown said that he asked for consent to search and that Holder handed him a Sonic cup. The cup contained "crushed up pseudoephedrine pills." Appellant told Officer Brown that she had purchased the Sudafed and that she was going to be paid $200 to transport it to Oklahoma. Officer Brown found three more pills in the passenger seat.

On cross-examination, Officer Brown stated that, when he first asked appellant about the purchase, he used the brand name Sudafed to describe the pseudoephedrine tablets. She denied purchasing Sudafed. Toward the middle of the interview, Officer Brown stated that appellant used the brand name Sudafed to describe the tablets she had purchased. Officer Brown also stated that no containers for the pseudoephedrine tablets were found and that neither appellant nor Holder indicated that they had purchased the pseudoephedrine with the intent to manufacture methamphetamine. He did not make an arrest and allowed the two to continue on to Oklahoma.

On redirect, Officer Brown stated that he did not know what appellant and Holder were going to do with the cup of crushed pseudoephedrine tablets but that he speculated they would use the crushed tablets for some sort of criminal activity. Officer Brown stated that he did not participate in the follow-up investigation.

Officer Birdsell testified that he had received training with regard to clandestine labs that manufactured methamphetamine. Pseudoephedrine was both a necessary ingredient of and a precursor to methamphetamine. Based on a report from the dispatcher who was in the Runnin' Reds store, Officer Birdsell stated that he was patrolling the streets looking for a black car near the store. Officer Birdsell saw the car in the store parking lot. Appellant was the driver.

Officer Birdsell saw Holder give Officer Brown a Sonic cup. Inside the cup were "numerous pseudoephedrine tablets." Consent was given to search, and the officers found no packaging for the pseudoephedrine tablets.

6

On cross-examination, Officer Birdsell stated that he talked to appellant. She told him that she was going to be paid $200 when she returned to Oklahoma with the pseudoephedrine. She told him that she was selling the tablets to a truck driver. Officer Birdsell testified that the amount appellant had was "too much" to be "for personal use." Officer Birdsell also stated that he thought they had violated the law against the purchasing of a precursor for the production of methamphetamine.

On redirect, Officer Birdsell testified that appellant told him she was buying the pseudoephedrine for Carroll Price of Wayne, Oklahoma.

Kaye Davis, a chemist with the Garland Texas Department of Public Safety crime laboratory, testified that she had training with the Drug Enforcement Administration in the operation of clandestine laboratories and had been working with investigations of clandestine laboratories since 1979. Davis stated that pseudoephedrine was the "principal ingredient" in making methamphetamine illegally. The "Nazi" method and the "Red P" method were the most common methods used. In both methods, pseudoephedrine was the precursor and, therefore, was the main ingredient to the illegal manufacture of methamphetamine. Davis stated that pseudoephedrine was found in over the counter medicines such as Sudafed. Davis described the process for each method. For each method, the pseudoephedrine must first be broken into a fine powder. Then, the "binders" in the Sudafed or pseudoephedrine would need to be removed to ensure a more efficient chemical reaction in the remaining process.

Davis testified that the discovery of crushed pseudoephedrine pills would indicate to her that the process of illegal manufacture of methamphetamine had begun. Davis identified the substance from the Sonic cup as pseudoephedrine and stated that it weighted 30.12 grams.

Gainesville Police Investigator Timothy Green also testified concerning the manufacture of methamphetamine. Investigator Green stated that the first step was to grind up the pseudoephedrine. In this case, Investigator Green stated that the pseudoephedrine in the Sonic cup was "mashed up and appeared to be in a dissolving process." Investigator Green further testified that, in his experience and training, he knew of no other reason to possess the amount and condition of pseudoephedrine in the Sonic cup other than to manufacture methamphetamine.

Appellant testified that she lived in Oklahoma and had worked off and on for her mother in her mother's convenience store in Wayne, Oklahoma. While her sister used methamphetamine and had been involved with methamphetamine labs, appellant stated that, because of her sister's experiences, she had never used methamphetamine and had never intended to manufacture methamphetamine.

Around noon on the day in question, she and Holder had gone to play cassino-type bingo about seven miles from where she lived. She won almost $700. Between 2 - 3 p.m., she and Holder had decided to drive to Texas to go shopping and to see her cousin. Holder was driving when they were pulled over for speeding in Denton. They never made it to her cousin's house in Flower Mound because her cousin was called out to work as an anesthesiologist. They mostly "window shopped" and arrived in Gainesville about 11:45 p.m.

They stopped at the Sonic to get something to drink and then went to the Runnin' Reds to get gas. While she was in the store, appellant saw the Max brand bottles of pseudoephedrine. The bottles contained thirty-six 60 mg tablets. Appellant testified that she could not buy the Max brand in Oklahoma because they had been "pulled off of the shelf." Truck drivers bought the medicine from her mother's store. Appellant testified that she thought she could make a profit by buying the tablets in Texas and reselling them at her mother's store.

Appellant attempted to purchase four bottles containing thirty-six pills; however, the clerk told her that she could only buy two bottles. She bought two bottles, and then Holder purchased two more. When they got to the car, they combined the contents of all four bottles into one bottle and threw away the three empty bottles. Appellant stated that her intent was to sell the pills for a profit and not to manufacture methamphetamine. They poured the pills into one bottle because it was more convenient, and she did not want to have four bottles "rolling around in [her] purse." Appellant stated that she believed the pills were illegal in Oklahoma.

When they saw the police cars, appellant testified that she assumed the police "were there for her." She pulled over immediately. She was scared and was afraid that she had done something illegal. She thought that the clerk had made a mistake and sold them too much of the pseudoephedrine. Holder poured half of the pills into the Sonic cup because they believed it was

8

legal to have two bottles of the pseudoephedrine. Appellant stated that she had told Holder to "dump and conceal" the pills in the Sonic cup.

When the officer first asked if she had bought Sudafed, she replied that she had not bought Sudafed. When she told the officer that he could not search the car, the officer did not allow her to call an attorney friend and told her that they did not need consent to search. The officers said that they "could do it either the easy way or the hard way." When the officers only found a couple of loose tablets, appellant stated that they became irate. The officers wanted to remove the door panels of the vehicle. Because this was Holder's mother's vehicle, appellant asked if she could call Holder's mother. The officers said that she could not. Appellant was beginning to worry about her two boys who were at her home in Oklahoma alone. She was also worried about going to jail. All of this happened before Holder signed a consent form.

When Holder asked her what he should do with the Sonic cup, appellant testified that she told Holder to do whatever he wanted to with it. Holder then handed the cup to the officers. Appellant testified that the officers had to pour out the drink and the ice to find where the pills had already melted.

The officers allowed them to leave, and they drove home to Wayne, Oklahoma. The next day, she told Wayne City Police Officer Ron Reagan about the incident.

Appellant emphasized that her intent was to purchase the pseudoephedrine to sell for a profit to truck drivers at her mother's store in Oklahoma. She did not intend to manufacture or to sell it to someone who intended to manufacture methamphetamine. Appellant stated that she told the officers that she had come to Texas to buy the Max brand for her mother to resell in Oklahoma at her store.

Holder testified that, around 7:00 or 8:00 p.m., they left Oklahoma to come to Texas to visit appellant's cousin. They went "to bingo farting around on the way." When they were in Gainesville, appellant went into the store first to buy all the Max brand pills that she could. He went in after her. They each bought two bottles, and each bottle contained thirty-six pills. They had no intent to manufacture methamphetamine. They bought the pills for appellant to sell to truck drivers at her mother's store. They took all the pills from the four bottles and poured them into one bottle. Holder stated that that was how appellant "had done it before." They threw the other bottles in the trash.

9

Holder first noticed the officers when they were leaving the Sonic. He stated that the police cars were "just coming out from everywhere like we'd just robbed a bank or something." The police "scared [him] to death," and he knew that something was going on. They were not speeding, and the only other thing they had done in Gainesville was to go to the Sonic. Holder testified that he "[j]ust freaked completely out" and poured the pills into the Sonic cup.

Holder testified that he had never been pulled over by two or three officers and that he did not know what to do. He did not remember signing a consent to search form. They told the officers that they had children asleep at home and that they had borrowed his mother's car. He also told the officers that no one really knew they were in Gainesville.

Holder testified that he gave the officers the Sonic cup after the officers described how they were going to "get rough" with appellant and him. The officers were upset with them and were "kind of p----d off when they looked all over the car and didn't find the pills that they supposedly had sat and watched us get." Holder stated that they had no intent to use or let someone else use the pseudoephedrine to manufacture methamphetamine.

The jury, as the finder of fact, was the sole judge of the weight and credibility of the witnesses' testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (Vernon 2007), art. 38.04 (Vernon 1979). This court has the authority to disagree with the factfinder's determination "only when the record clearly indicates such a step is necessary to arrest the occurrence of a manifest injustice." *Johnson*, 23 S.W.3d at 9. Circumstantial evidence of intent must be reviewed with the same scrutiny as any other element of the offense. *Laster*, 275 S.W.3d at 519-20.

After reviewing the record in the light most favorable to the verdict, we find that the evidence is legally sufficient. A reasonable jury could have concluded that appellant committed the offense. A reasonable jury could have inferred appellant's intent to involve the pseudoephedrine in the manufacture of methamphetamine from her actions of purchasing the pills in Texas when she believed it was illegal to do so in her home state, of removing the pills from the original packaging even though she testified that she planned to resell them in her home state, and of disposing of the original packaging as well as the crushing and placement of the pills in the Sonic cup. This evidence together with the expert testimony concerning pseudoephedrine as the key ingredient in and as the precursor to methamphetamine, the testimony concerning the methods for manufacturing

10

methamphetamine, the expert testimony that the crushed pseudoephedrine in the Sonic cup appeared to be in the first stage of manufacturing for methamphetamine, and the expert testimony that the amount of 30.12 grams of medicine was more than what was appropriate for personal use is legally sufficient to support the jury's determination.

Likewise, when the evidence is reviewed in a neutral light, we find that there is factually sufficient evidence to support the verdict. While appellant and Holder denied any intent to manufacture methamphetamine, there were inconsistencies in their testimony about the events of that day. A rational jury could consider these inconsistencies when it determined the weight and credibility of all of the evidence. We do not find that the evidence supporting the verdict is so weak that the verdict is clearly wrong and manifestly unjust or that the verdict is against the great weight and preponderance of the conflicting evidence. The second point is overruled.

The judgment of the trial court is affirmed.


JIM R. WRIGHT

CHIEF JUSTICE


October 29, 2009

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Hill, J.[1]

---

[1]John G. Hill, Former Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.

In The

# Eleventh Court of Appeals

————

## No. 11-07-00297-CR

————

## RONNIE DAVENPORT, Appellant

## V.

## STATE OF TEXAS, Appellee

**On Appeal from the 235th District Court**

**Cooke County, Texas**

**Trial Court Cause No. 06-186**

### D I S S E N T I N G   O P I N I O N

I respectfully dissent because the evidence is legally insufficient to support the conviction. Ronnie Davenport's conviction is for possession of pseudoephedrine with the intent to manufacture methamphetamine. The State showed that Davenport possessed pseudoephedrine and that, by causing it to be put in a soft drink, produced a substance consistent with that produced in the early stages of the manufacturing of methamphetamine. One witness testified that there was no other reason to possess the amount of pseudoephedrine in a cup of Coca-Cola other than to manufacture methamphetamine.

It is generally understood that methamphetamine is manufactured at methamphetamine labs, with the use of other chemical precursors. In all cases of which I am aware, convictions of this offense have been obtained by showing the defendant's possession of other precursors or the defendant's connection with methamphetamine labs.

In this case, there is no showing that Davenport was in possession of any other precursor used in the manufacture of methamphetamine and no showing of any connection between her and any methamphetamine lab. Instead, the theory appears to be that she and her companion, Tommy Holder, put the pseudoephedrine tablets in a cup of Coca-Cola with the intention of beginning the process of manufacturing methamphetamine.

I would agree that the evidence is sufficient to show that Davenport intended that the pseudoephedrine be put in the cup of Coca-Cola. I would agree that there is evidence from which a reasonable jury could conclude that the result is equivalent or similar to that obtained in the early manufacture of methamphetamine. What is missing is any evidence from which it might reasonably be inferred that Davenport intended, by having the pseudoephedrine placed into the Coca-Cola, to begin the process of manufacturing methamphetamine.

Juries may make inferences that are supported by the evidence at trial but are not permitted to come to conclusions based on mere speculation or factually unsupported inferences or presumptions. *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). Because it is not generally understood that mixing pseudoephedrine with Coca-Cola produces something that can be compared to the beginning of the process of manufacturing methamphetamine or that the manufacture of methamphetamine occurs outside of methamphetamine labs, a finding that Davenport intended to begin the process of manufacturing methamphetamine by mixing pseudoephedrine with Coca-Cola, outside of the context of a methamphetamine lab, is an inference based on mere speculation and is factually unsupported. It is based upon the supposition that she must have special knowledge by which she would know that the mixing of the two outside the context of a methamphetamine lab would constitute the beginning of the process of manufacturing methamphetamine. There was no showing of any special knowledge Davenport possessed by which she would know that her action would result in the manufacture of methamphetamine or that methamphetamine could be manufactured outside of the context of a methamphetamine lab. Consequently, any inference that by mixing the two, Davenport intended that result would be unreasonable, absent her possession of another precursor besides methamphetamine, a connection to a methamphetamine lab, or evidence that she possessed special knowledge of the process of manufacturing methamphetamine.

I would sustain Davenport's second point on appeal, reverse the judgment, and remand to the trial court for the purpose of the entry of a judgment of acquittal.

JOHN G. HILL

JUSTICE

October 29, 2009

Publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J., McCall, J., and Hill, J.[2]

---

[2]John G. Hill, Former Justice, Court of Appeals, 2nd District of Texas at Fort Worth, sitting by assignment.