

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| THE STATE OF TEXAS, | § | No. 08-17-00175-CR |
| | § | |
| Appellant, | § | Appeal from |
| | § | |
| v. | § | County Criminal Court at Law No. 4 |
| | § | |
| JESUS TABARES, | § | of El Paso County, Texas |
| | § | |
| Appellee. | § | (TC # 20140C13890) |
| | § | |

**O P I N I O N**

Following a traffic stop, Jesus Tabares was subsequently arrested for driving while intoxicated. A video documents him failing a field sobriety test and a breath sample taken after the stop showed his alcohol concentration level was above the legal limit. The trial court, however, granted his suppression motion and found that the stop was illegal, which resulted in the exclusion of the State's evidence, including the results of the field sobriety test and breath sample. The stop, including everything that transpired from thirty seconds before the police officer turned on his emergency overhead lights is documented on the police cruiser's dash-cam video. The State argues in this interlocutory appeal that the video presents indisputable evidence that several of the trial court's fact findings are erroneous. Given our standard of review, however, we disagree and affirm the ruling below.

## BACKGROUND

Appellee was charged with driving while intoxicated with a blood alcohol level over 0.15. TEX.PENAL CODE ANN. § 49.04. The charge arose out of a traffic stop in the early morning of December 21, 2014. Sergeant John William Van Valen initiated the stop. He was patrolling the 1600 block of North Zaragoza at 5:05 a.m. when he spotted Tabares's vehicle. At that point, North Zaragoza is a five-lane roadway with two lanes in each direction divided by a center turning lane. Tabares's vehicle was ahead of Sergeant Van Valen's. Both were traveling the same north bound direction and in the same inside lane.

The trial court relied on three sources of information which further explain the circumstances of the stop: (1) Sergeant Van Valen's testimony at the suppression hearing; (2) his complaint affidavit made near the time of the arrest; and (3) a dash-cam video. We describe each separately.

### Sergeant Van Valen's Testimony

While patrolling North Zaragoza, Sergeant Van Valen testified that he witnessed Tabares commit three moving violations: (1) operating his vehicle without headlamps, (2) operating his vehicle without tail lamps, and (3) changing lanes without signaling. When he first noticed Tabares's vehicle it was traveling in the same direction and about a half block ahead of his. He witnessed Tabares make several lane changes without signaling. Not all of these lane changes were caught on the police cruiser's dash-cam video recorder. That camera only saves thirty-seconds of images immediately prior to when the emergency beacon is turned on.

The Sergeant surmised that Tabares's headlights were not turned on because he could not see them illuminate the street. The taillights were also not engaged until a specific time when the taillights "flare[d] up, because he's turning them on." Tabares's counsel made the point, however,

2

that Sergeant Van Valen had not specifically included in his complaint affidavit any mention of the taillights suddenly coming on. The Sergeant agreed that department training requires that relevant observations be included in police reports and complaint affidavits. He also agreed that if Tabares turned on his lights halfway through the stop, that would be a relevant fact. On cross-examination, the Sergeant conceded that driving without lights would be dangerous to other cars in the area, but there was some delay in the officer initiating the stop.

When Sergeant Van Valen engaged his overhead flashing lights, Tabares quickly turned into a retail parking lot where the officer on approaching him noticed signs of intoxication.

At the hearing, the trial court questioned the Sergeant as follows:

COURT: Okay. So the first time you were made aware of his presence was he was in front of you -- it's hard to tell in the video -- give or take, half a block?

SGT. VAN VALEN: Give or take, Your Honor.

. . .

COURT: So at all times relevant, you were behind him?

SGT. VAN VALEN: Yes.

COURT: How do you know he was traveling without headlights? If he was in front of you?

SGT. VAN VALEN: I would say the same comparison that -- when you look at the video in the parking lot? -- you see, like, basically an area where the light of the lamps hits the ground.

. . .

COURT: Okay. How could you tell his headlights were on or off if he was half a block in front of you, his tail was facing you -- not his headlights, and you were behind him? He didn't pass you. He was in front of you all the time. How could you tell his headlights were on or off?

SGT. VAN VALEN: By the lack of the lamp illumination on the roadway.

COURT: Half a block, or thereabouts, in front of you. Is that what you're saying?

SGT. VAN VALEN: Yes, Your Honor.

3

## The Complaint Affidavit

Sergeant Van Valen signed a notarized complaint affidavit at the time of the arrest. In it, he states that Tabares was driving his vehicle "without headlights or tail-lights" and that he observed Tabares's vehicle make "several lane changes without signaling intent." As we note above, Tabares emphasized at the hearing that the complaint affidavit does not mention that Tabares turned his lights on as Officer Van Valen testified to at the hearing.[1]

## The Dash-Cam Video

The State admitted the dash-cam video of the stop which captures the events thirty seconds before the overhead lights are turned on. The video begins at time stamp 05:05:27. When the video begins, Tabares's car is barely visible and is in the inside lane, traveling ahead of the officer's vehicle. The sky is dark and the streetlights along North Zaragoza are illuminated. Given the curvature of the terrain, however, some fixed lights in the far distance are closer to street level and at times briefly merge with and partially obscure the view of Tabares's vehicle. Nonetheless, in the first thirteen seconds of the video, Tabares's vehicle is visible and appears to have at least a single light source centered on the rear of his car.

At the 05:05:37 mark, Tabares's vehicle moves into the center turn lane and by the 05:05:40 mark, it moves back into the inside driving lane. There is no turn signal visible for either lane change, but owing to the clarity of the video, we cannot unequivocally discount some signal might

---

[1] Hence, this exchange:

> [DEFENSE COUNSEL]: Where in your complaint affidavit are you referencing that the defendant turned on his lights? And you can read it.
> [SGT. VAN VALEN]: It doesn't say that. But it says that I observed him without the tail lamps.
> [DEFENSE COUNSEL]: Okay.
> [SGT. VAN VALEN]: So if the video shows that the lights are on, so they're -- There's a point where the lights were turned on.
> [DEFENSE COUNSEL]: Okay. So you did -- But you didn't write that down; that specific thing, it's not in your report?
> [SGT. VAN VALEN]: Not in that manner.

4

have been made. Also, at the 05:05:40 mark, the rear lights suddenly illuminate on the back of Tabares's vehicle. What had appeared on the video as a single light centered on the back of Tabares's vehicle, thereafter distinctly showed two taillights and his lighted license plate. The Sergeant's police cruiser had, however, somewhat closed the distance between the two vehicles in that time frame.

Tabares's vehicle then drifts within his lane of traffic until the Sergeant's overhead lights are initiated at the 05:05:57 mark, which caused Tabares to apply his brakes (clearly noted by the illumination of his rear brake lights). Tabares immediately signals a right-hand lane change, then changes to a left-hand turn signal, and he then executes a left-hand turn into a parking lot. His headlights are visibly on as he turns into the parking lot.

**Trial Court Ruling and Findings**

Immediately after Sergeant Van Valen testified the trial court granted the motion to suppress. The court expressed from the bench its concern with the Sergeant's credibility, based on (1) "the discrepancy between what is obviously on the video and what is on the affidavit"; and (2) the Sergeant's "inability to explain how he was able to see the headlights being on or off at the distance[.]" Following the hearing, the trial court signed an order granting the motion to suppress.

Subsequently, the trial court issued written findings, the most relevant of which are as follows:

> 7. At the suppression hearing, Sgt. Van Valen identified specific portions of the video that, he contended, supported his observations.
>
> 8. The Court reviewed the dash cam video multiple times and compared the recording with Sgt. Van Valen's sworn complaint affidavit and in court testimony.
>
> . . .
>
> 12. There are clear discrepancies between what is depicted on the dash cam video and Sgt. Van Valen's sworn complaint affidavit and in court testimony.

5

13. The Defendant's vehicle's headlights and taillights are visibly on at all relevant times on the dash cam video.

14. The Defendant's vehicle's taillights become more clearly illuminated when the Defendant engages and then disengages the brakes of his vehicle in response to Sgt. Van Valen conducting the traffic stop.

15. During the relevant time, the Defendant's vehicle does not change lanes.

From these fact findings the trial court concluded that the Sergeant's stated rational for stopping Tabares (the failure to use headlights, taillights, or turn signals) was not credible. The trial court further concluded that the "dash cam video does not support, and sometimes even contradicts Sgt. Van Valen's stated reasons for conducting a warrantless traffic stop." Ultimately, the trial court concluded Sergeant Van Valen "lacked even reasonable suspicion, much less probable cause, to conduct a warrantless traffic stop."

The State brings two issues in this interlocutory appeal. *See* TEX.CODE CRIM.PROC.ANN. § 44.01(a)(5)(permitting appeal of order suppressing evidence of substantial importance to the case). First, the State contends that the trial court's adverse credibility finding concerning the headlights is contrary to the indisputable video evidence and the record. In its second issue, the State contends that the indisputable video evidence establishes reasonable cause to initiate a traffic stop based on Tabares failing to use taillights and signal lane changes.

**CONTROLLING LAW**

Tabares was stopped without a warrant and without his consent; accordingly, the State had the burden of proving the reasonableness of the stop. *See Castro v. State*, 227 S.W.3d 737, 741 (Tex.Crim.App. 2007); *Young v. State*, 133 S.W.3d 839, 841 (Tex.App.--El Paso 2004, no pet.). A peace officer's decision to stop an automobile passes Fourth Amendment scrutiny when the officer has a reasonable articulable suspicion that criminal activity may be afoot. *See Terry v. Ohio*, 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968). Reasonable suspicion exists

6

when, based on the totality of the circumstances, an officer has specific articulable facts which lead him or her to conclude that the person is, has been, or soon will be engaged in criminal activity. *Furr v. State*, 499 S.W.3d 872, 878 (Tex.Crim.App. 2016); *Woods v. State*, 956 S.W.2d 33, 38 (Tex.Crim.App. 1997). The "legality of a traffic stop based on reasonable suspicion does not depend upon a showing that an actual offense was committed; it is sufficient to show that the officer reasonably believed that an offense was in progress." *State v. Torrez*, 490 S.W.3d 279, 283 (Tex.App.--Fort Worth 2016, pet. ref'd); *accord Pena v. State*, No. 08-16-00028-CR, 2018 WL 3569367, at *2 (Tex.App.--El Paso July 25, 2018, no pet.)(not designated for publication).

Under this standard, an officer may lawfully stop and detain a person for a traffic violation that the officer witnesses. *See Garcia v. State*, 827 S.W.2d 937, 944 (Tex.Crim.App. 1992); *State v. Prieto*, No. 08-12-00268-CR, 2018 WL 447123, at *3 (Tex.App.--El Paso Jan. 17, 2018, no pet.)(not designated for publication)(failure to signal justified initial stop that later lead to finding contraband in vehicle); *see also* TEX.CODE CRIM.PROC.ANN. art. 14.01(b)("A peace officer may arrest an offender without a warrant for any offense committed in his presence or within his view."); TEX.TRANSP.CODE ANN. § 543.001 ("Any peace officer may arrest without warrant a person found committing a violation of this subtitle.").

And as relevant here, a "vehicle shall display each lighted lamp and illuminating device required by this chapter to be on the vehicle: (1) at nighttime; and (2) when light is insufficient or atmospheric conditions are unfavorable so that a person or vehicle on the highway is not clearly discernible at a distance of 1,000 feet ahead." TEX.TRANSP.CODE ANN. § 547.302(a)(1)&(2). The same code chapter requires both headlights and taillights. TEX.TRANSP.CODE ANN. § 547.321(a)(headlights); TEX.TRANSP.CODE ANN. § 547.322(a)(taillights). A "taillamp shall emit a red light plainly visible at a distance of 1,000 feet from the rear of the vehicle." *Id.* at §

7

547.322(d). A person commits a misdemeanor offense if the person operates a vehicle that is not equipped in a manner that complies with the vehicle equipment standards and requirements established by Chapter 547 of the Texas Transportation Code. *Id*. at § 547.004(a)(2). Additionally, a driver must use their turn signal to indicate an intention to turn or change lanes "continuously for not less than the last 100 feet of movement of the vehicle before the turn." TEX.TRANSP.CODE ANN. § 545.104(b). And as we note above, "[i]f an officer has a reasonable basis for suspecting that a person has committed a traffic offense, the officer may legally initiate a traffic stop." *Zervos v. State*, 15 S.W.3d 146, 151 (Tex.App.--Texarkana 2000, pet. ref'd).

## STANDARD OF REVIEW

We review a trial court's ruling on a suppression motion for an abuse of discretion. *Crain v. State*, 315 S.W.3d 43, 48 (Tex.Crim.App. 2010); *Ramos v. State*, 245 S.W.3d 410, 417-18 (Tex.Crim.App. 2008). An abuse of discretion occurs when the trial court's decision was so clearly wrong as to lie outside the zone of reasonable disagreement. *Cantu v. State*, 842 S.W.2d 667, 682 (Tex.Crim.App. 1992); *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990)(op. on reh'g). Our review of this discretion is bifurcated. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim.App. 2000), *citing Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex.Crim.App. 1997). Under this bifurcated standard, we afford almost total deference to a trial court's determination of historical facts, but we review pure questions of law *de novo*. *Alford v. State*, 358 S.W.3d 647, 652 (Tex.Crim.App. 2012); *see Montanez v. State*, 195 S.W.3d 101, 109 (Tex.Crim.App. 2006). Likewise, we give almost total deference to a trial court's resolution of mixed questions of law and fact if those questions turn on the credibility and demeanor of witnesses. *Alford*, 358 S.W.3d at 652. However, if credibility and demeanor are not necessary to the resolution of a mixed question of law and fact, we review the question *de novo. Alford*, 358 S.W.3d at 652; *Young v. State*, 283

8

S.W.3d 854, 873 (Tex.Crim.App. 2009).

We also review the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex.Crim.App. 2006). "The winning side is afforded the 'strongest legitimate view of the evidence' as well as all reasonable inferences that can be derived from it." *State v. Duran*, 396 S.W.3d 563, 570 (Tex.Crim.App. 2013), *quoting State v. Weaver*, 349 S.W.3d 521, 525 (Tex.Crim.App. 2011). The trial court is the sole trier of fact as to the credibility of the witnesses and the weight to be given to their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex.Crim.App. 2000). Accordingly, the trial court may believe or disbelieve all or any part of a witness's testimony even if that testimony is not controverted. *Id.*

This same deferential standard of review applies to a trial court's determination of historical facts, demeanor, and credibility even when that determination is based on a video recording. *State v. Duran*, 396 S.W.3d 563, 570 (Tex.Crim.App. 2013). The Texas Court of Criminal Appeals has expressly rejected the proposition that a video changes the "almost total deference standard." *Montanez*, 195 S.W.3d at 109. Nonetheless, we must still determine whether the evidence, when viewed in the light most favorable to the trial court's ruling, supports the trial court's fact findings. *State v. Kelly*, 204 S.W.3d at 818. Hence, we may reject a trial court fact finding if it is contrary to "indisputable visual evidence." *Duran*, 396 S.W.3d at 570; *State v. Houghton,* 384 S.W.3d 441, 446 (Tex.App.--Fort Worth 2012, no pet.)(the reviewing court is to give almost total deference to the trier of fact's factual determinations unless the video recording indisputably contradicts those findings). But even then, the question remains of whether "a witness actually saw what was depicted on a videotape[.]" *Duran*, 396 S.W.3d at 570.

**APPLICATION**

The State's first issue argues that the video provides indisputable evidence that Tabares's

headlights were not operating when the officer first approached him from the rear, which in turn makes the trial court's adverse credibility unsupported by the record and entitled to no deference. One thread of this argument also urges that we can also discount that credibility determination because it is based on the trial court's false premise that Sergeant Van Valen was unable to explain how he knew Tabares's headlights were off. The trial court's credibility determination, however, was grounded in at least two other reasons: (1) the trial court's skepticism that one can visualize whether the headlights of a vehicle a half block ahead of, and traveling in the same direction of an observer are turned on; and (2) "clear discrepancies between what is depicted on the dash cam video and Sgt. Van Valen's sworn complaint affidavit and in court testimony." The trial court also had the benefit of directly questioning the Sergeant and perceiving his demeanor. The non-video portions of the record do not undermine the trial court's credibility finding. As to the video itself, we cannot say that it shows whether the headlights were on or off as Sgt. Van Valen first approached Tabares's car. We must therefore abide by the trial court's credibility determination and discount the Sergeant's testimony.

The State's better argument is that at 05:05:40 of the video the rear lights on both sides of Tabares's vehicle light up. From that point forward, three lights are visible on the rear of Tabares's vehicle. If the taillights were off before that point, it is at least likely that the headlights would be out as well because headlights and taillights usually work in tandem. *See* TEX.TRANSP.CODE ANN. § 547.322(g)("taillamp, including a separate lamp used to illuminate a rear license plate, must emit a light when a headlamp or auxiliary driving lamp is lighted."). At the hearing, Tabares suggested the flare up could have been the vehicle's brake lights additionally illuminating the rear of the car. In his brief, Tabares also points to testimony from the Sergeant that he would not concede the apparent operation of the brake lights at 05:05:57 of the video, because at that point, the trunk area

10

of Tabares's vehicle on the video is "distorted" and looked like "one continuous bar[.]"[2] The trial court findings seem to adopt one or both of these rationales, noting that the taillights were on at all relevant times and "become more clearly illuminated" when Tabares taps on his brakes. Sgt. Van Valen was questioned about the video while it was played to the trial court. As one of the trial court fact findings state, he identified specific portions of the video that he claimed supported his justification for the stop. While the video contains time stamps, none of the hearing testimony is tied to any of the time stamps. That is to say, the questioning attorneys did not precisely identify which segment of the video their question pertained to. This creates some ambiguity in the record about what the trial court considered as the "relevant time" in its fact findings. This ambiguity further cautions that the trial court's conclusions are entitled to deference.

We perceive another problem with the State's argument. While the State places great significance on the flare-up of the rear lights at 05:05:40 of the video, the fact of the flare-up was never mentioned in the Sergeant's complaint affidavit. While one inference from that omission might be a simple oversight, another inference is that the Sergeant did not actually perceive that event which is caught on the video. In other words, just because the video captured the event does not mean that the that Sergeant perceived it at the time and utilized the information to inform the decision to stop Tabares.

That same issue arose in *State v. Duran*. In that case, a motorist turned in front of a police cruiser which was speeding down a throughway with its emergency overhead lights off. 396 S.W.3d at 567. Even though the police cruiser was on its way to a domestic dispute, it disengaged from that call to pursue the motorist. *Id*. The motorist had turned from the throughway onto a side street. *Id*. The police cruiser's dash cam documented that the motorist, while on the side street,

---

[2] As the Sergeant stated: "Well, to me, it's distorted. Because the trunk and the whole -- the way the video looks, it's all--it's distorted."

crossed the center line which would otherwise be a traffic violation. *Id.* The motorist was eventually stopped and later arrested for DWI. A trial court suppressed the DWI evidence based on the conclusion that the officer unjustifiably decided to stop the motorist for almost causing a collision--one actually caused by the officer's own conduct. *Id.* at 568. The trial court concluded that the center stripe violation even if shown on the video was not the basis for the stop. *Id.* Based on the video showing the lane violation, this Court reversed the trial court, but we in turn were reversed by the Texas Court of Criminal Appeals that wrote:

> The question of whether an officer has reasonable suspicion to detain an individual for further investigation is determined from the facts and circumstances actually *known* to the officer at the time of the detention--what he saw, heard, smelled, tasted, touched, or felt--not what that officer could have or should have known. The standard is not what an omniscient officer would have seen, but rather what a reasonable officer would have done with what he actually did see. Here, the trial judge was entitled to disbelieve Officer Candia's testimony that he made the stop after seeing the center stripe violation.

*Id.* at 572 (footnotes omitted).

That same logic applies here. The trial court pointed to the contradiction between the complaint affidavit and the Sergeant's testimony. The only contradiction is one of omission--the complaint affidavit never mentions the flaring-on of the taillights, even though that is centerpiece of the State's argument. Even if the video indisputably shows that Tabares's lights flared on, that does not compel the conclusion that the police Sergeant perceived that event and acted on it at the time of the stop. The State's first issue is overruled.

The State's second issue argues that the video indisputably shows that the Sergeant had reasonable suspicion to pull Tabares over for failing to have turned on his taillights or use a turn signal in making a lane change. We disagree. The trial court found that the video shows the "taillights are visibly on at all relevant times[.]" The trial court also found during the "relevant time" Tabares's "vehicle does not change lanes." While we might differ on this latter point, the

12

video does not indisputably require us to overturn the trial court's findings. Judge Alcala once wrote that "[r]arely will videotape evidence actually be 'indisputable.'" *Tucker v. State*, 369 S.W.3d 179, 187 n.1 (Tex.Crim.App. 2012)(Alcala, J., concurring). She pointed to problems of clarity with video evidence because of lighting, angle, focus of the camera, or distance from the object being recorded. *Id.* We could add to that list the quality and settings of the monitor used to view a video. In this case, the first thirteen seconds of the video is somewhat grainy and unfocused. Background and on-coming car lights intermittently obscure the detail of Tabares's vehicle. While we might have reached a different conclusion were the issue *de novo* before us, we cannot say the video indisputably shows that Tabares did not have his rear taillights lights on or that he did not use a blinker in changing lanes in that first segment. The later video segments show the taillights and headlights were engaged.

We overrule Issue One and Two and affirm the trial court's ruling below.

May 22, 2019

ANN CRAWFORD McCLURE, Chief Justice

Before McClure, C.J., Rodriguez, and Palafox, JJ.

(Do Not Publish)

13